CHICAGO, ST. P., M. & O. RY. CO. v. BELLIWITH.

(Circuit Court of Appeals, Eighth Circuit.   November 15, 1897.)

No. 869.

1. CONTRACTS—PARTY UNABLE TO READ.
   If one cannot read a contract which he is about to execute, it is as much his duty to procure some reliable person to read and explain it to him before he signs it as it would be to read it himself if he were able to do so, and his failure to obtain a reading and an explanation of it is such gross negligence as will estop him from repudiating it on the ground that he was ignorant of its contents. One who has received the benefits of a written contract in silence cannot escape its burdens by proof that he did not know and did not inquire what these burdens were when he assumed them.

2. PRINCIPAL AND AGENT—NOTICE.
   Notice to and knowledge of an agent or attorney, acquired and present in his mind while he is exercising the powers and discharging the duties of his agency, are notice to and knowledge of his principal.

3. CONTRACTS—FRAUD AND MISTAKE.
   A written instrument cannot be avoided for fraud or mistake unless the evidence of the fraud or mistake is clear, unequivocal, and convincing.

4. TRIAL IN FEDERAL COURTS—DIRECTING VERDICTS.
   The judges of the federal courts are not required to submit a question to the jury merely because there is some evidence in support of the case of the party who has the burden of proof, but at the close of the evidence it is their duty to direct a verdict for the party who is clearly entitled to it, when it would be their duty to set aside a verdict in favor of his opponent if one were rendered. At the close of the evidence there is always a preliminary question for the judge,—not whether there is literally no evidence, but whether there is any substantial evidence, upon which the jury can properly render a verdict in favor of the party who produces it.

5. ADMISSIBILITY OF EVIDENCE—HEARSAY—WAIVER OF SETTLEMENT.
   Where a railroad company, through its attorney, made a settlement with one claiming damages for personal injuries, and took a release from him, *held*, that testimony that a claim agent of the company, who was not present at such settlement, had afterwards said to the witnesses that the company had never made any general settlement with the claimant, but had only given

him a little money to help him along, was inadmissible to show a waiver of the settlement, in the absence of anything to show that such agent had any authority to abrogate or waive settlements made by the company's counsel, and also as being mere hearsay.

In Error to the Circuit Court of the United States for the District of Minnesota.

On September 15, 1894, a freight train was wrecked on the track of the Chicago, St. Paul, Minneapolis & Omaha Railway Company, the plaintiff in error, on its road between Minneapolis and Menomonie, in the state of Wisconsin. A tank in the wreck, which contained oil, took fire about 7 o'clock in the morning of that day, and, after burning about four hours, exploded and burned John Belliwith, the defendant in error. He was a passenger on a train which started that morning from Minneapolis, and arrived at the scene of the wreck in the forenoon of that day, before the explosion. The company stopped this train at a safe distance from the burning tank, made a gap in the fence on the south side of its right of way, opposite this train, and conducted Belliwith and the other passengers around the burning tank, through a field, to a point on the right of way a safe distance east of the tank, where they were led through another gap made in the fence, and left to await the arrival of a passenger train which was coming from the east to take them forward on their journey. After Belliwith had been safely led around the burning tank to this point, he voluntarily started back towards the passenger train which had brought him from Minneapolis, for the purpose, as he testified, of getting a package which he had forgotten and left in the car which he had occupied. The flames from the burning tank were leaping high in the air, and making so much noise that they were the most conspicuous objects in view. Instead of passing around them through the field, in the safe way in which he had been led east by the employés of the railway company, he went materially nearer the right of way of the company and the burning tank as he proceeded westward; and, just as he came near the tank, it exploded, and he was burned. He sued the company for negligence. It answered that it was not negligent; that Belliwith brought his injuries upon himself, by leaving the safe place to which he had been conducted by the company, and approaching nearer to the burning tank, without its knowledge or consent; and that on November 30, 1894, he had compromised his claim, and released the company from all liability for the injuries which he sustained from the explosion and burning, in consideration of $300, which the company had paid him on that day. Belliwith filed a reply to this answer, in which he denied that he had been negligent, denied the compromise and release, and alleged that he could not read or write; that on November 30, 1894, he demanded of the company a money settlement for his injuries; that the company would not pay him what he demanded, but paid him $200, and told him that it would help him along temporarily, and settle with him later. He also alleged that if the company had any release, claimed to be signed by him, it was a fabrication, and his consent to it was procured by artifice and deceit, and under a mistake, with no intention on his part to release any claim against the company, except for the value of the goods which he lost at the time of the accident. The case was tried to a jury, and these facts were established without controversy: Belliwith was a German peddler, who had been in this country 20 years, and had been engaged in his occupation of a peddler for 5 or 6 years. He could not read or write, but he gave more than 50 printed pages of testimony, in English, in this case, without the aid of an interpreter; and it evinces a ready understanding and a proper use by him of the English language. After his injuries he was treated in a hospital in St. Paul. When he had recovered sufficiently to go out on the streets of the city, and on the 21st day of November, 1894, he met an attorney at law, told him the facts regarding his claim against the railway company which is in suit here, employed him to prosecute that claim, and gave him a written power of attorney "to receipt for, settle, and compromise said cause of action as to him may seem fit, as fully and completely as said second party [Belliwith] might do if he were personally present, hereby ratifying every act by him done in the premises." His attorney immediately filed a copy of this power of attorney with the railway company, and commenced negotiations with Mr. Wilson, the general counsel of the company, for a settlement of this claim. Mr. Wilson

denied all liability on the part of the company, but after several interviews, and on November 29, 1894, he offered the attorney of Belliwith $300 for a compromise of the claim, and a release of the company from all liability on account of it. On the same day the attorney reported this offer to Belliwith, and on the next day they went together to Mr. Wilson's office, where, after some conversation, a written release and discharge of the claim, for the expressed consideration of $300, was prepared by Mr. Perrin, an assistant of Mr. Wilson, was signed with the name of Belliwith, by his attorney, while he touched the pen, and was delivered to the company; and $300 was then paid for it by the corporation to the attorney of Belliwith, who retained $100 for his fees, and gave $200 of it to his client. Belliwith went home, spent his money, and at the end of four months appeared to the company for the first time after the settlement, and presented a demand for more money and more settlement. The foregoing facts are undisputed, but the testimony which follows is contradicted: To avoid the written contract of compromise and release which he had made, Belliwith introduced in evidence, over the objection of the company, the testimony of one Kort, to the effect that Poole, who was the claim agent of the company, but who was not present at, and took no part in, the compromise made on November 30, 1894, said, six months after that settlement was made, that the company had never made a general settlement with Belliwith, but had given him a little money—a few hundred dollars—to help him out. For the purpose of avoiding the release, Belliwith himself testified that he lost a package worth $4.11 at the time of the accident; that the company never asked him to make a settlement; that he could not read or write; that he did not ask to have the paper that he touched the pen to read to him, and that it was never read to him; that his attorney told him that it was the settlement for the $4.11; that he supposed that it was; and that he never signed any release of any claim, except for the $4.11. But he also testified that when he saw his lawyer receive the $300 he knew it was more money than $4.11; that when he got home he found he had received $200; that he did not pay this money back to the company, but that he used it at home; and that it was a present to him from the company. He testified that his lawyer told him on the day before he executed the release that Mr. Wilson offered $300 to help him out, and that he replied that he did not want it, because they told him that to accept it would be to settle his claim; and he testified that, at the interview with Mr. Wilson on the day when the release was signed, Mr. Wilson offered him $300, and refused to pay him any more; that he told Mr. Wilson that he did not want it; and that he knew that, if he took it, its acceptance was a settlement. His attorney, who wrote Belliwith's name to the release while he touched the pen, and the assistant of Mr. Wilson, who drew the release, testified that after it was drawn, and before it was signed, it was handed to his attorney, who read it aloud in the presence of Belliwith. The court below refused to instruct the jury, at the request of the plaintiff in error, to return a verdict in its favor upon this evidence, refused to give other instructions which it requested, and gave instructions to which it excepted. These rulings are assigned as error.

L. K. Luse, for plaintiff in error.

Benjamin Davenport, for defendant in error.

Before BREWER, Circuit Justice, and SANBORN and THAYER, Circuit Judges.

SANBORN, Circuit Judge, after stating the case as above, delivered the opinion of the court.

A written contract of release cannot be annulled or avoided by proof that one of the parties to it, who was sound in mind and able in body, could not read or write, did not know the terms of the agreement, and neglected to ask any one to read it to him when he signed it. A written contract is the highest evidence of the terms of an agreement between the parties to it, and it is the duty of every contracting party to learn and know its contents before he signs and delivers it. He owes this duty to the other party to the contract,

because the latter may. and probably will, pay his money and shape his action in reliance upon the agreement. He owes it to the public, which, as a matter of public policy, treats the written contract as a conclusive answer to the question, what was the agreement? If one can read his contract, his failure to do so is such gross negligence that it will estop him from denying it, unless he has been dissuaded from reading it by some trick or artifice practiced by the opposite party. If he cannot read it, it is as much his duty to procure some reliable person to read and explain it to him, before he signs it, as it would be to read it before he signed it if he were able to do so; and his failure to obtain a reading and explanation of it is such gross negligence as will estop him from avoiding it on the ground that he was ignorant of its contents. This is a just and salutary rule, because the other contracting party universally acts and changes his position on the faith of the contract; and it would be a gross fraud upon him to permit one, who has received the benefits of the agreement in silence, to escape from its burdens by proof that he did not know and did not inquire what these burdens were, when he assumed them. Upton v. Tribilcock, 91 U. S. 45, 50; Fuller v. Insurance Co., 36 Wis. 599, 603; Sanger v. Dun, 47 Wis. 615, 620, 3 N. W. 388; Albrecht v. Railroad Co., 87 Wis. 105, 109, 58 N. W. 72; Wheaton v. Fay, 62 N. Y. 275, 283; Germania Fire Ins. Co. v. Memphis & C. R. Co., 72 N. Y. 90, 93; Hill v. Railroad Co., 73 N. Y. 351–353; authorities cited in Insurance Co. v. Norwood, 32 U. S. App. 490, 507, 16 C. C. A. 136, 145, and 69 Fed. 71, 80. A case in which the excessive zeal of a claim agent leads him to force his way into the sick room of an injured employé, where he lies alone, confined to his bed, and to procure a release from him by false representations, when his senses have been so stupefied by the use of opiates administered to relieve the tortures of excruciating physical pain that he cannot read it, and does not know its contents, or what course he ought to pursue to learn them, as in Railway Co. v. Harris, 158 U. S. 326, 15 Sup. Ct. 843; Id., 27 U. S. App. 450, 455, 12 C. C. A. 598, 601, and 63 Fed. 800, 803,—constitutes a rare exception to this general rule, which must not be permitted to interfere with its steady and uniform application to the cases which fall within it. Notice to and knowledge of the agent or attorney, acquired and present in his mind while he is exercising the powers and discharging the duties of his agency, are notice to and the knowledge of his principal. Smith v. Ayer, 101 U. S. 320, 325. A written instrument cannot be avoided for fraud or mistake unless the evidence of the fraud or mistake is clear, unequivocal, and convincing. Insurance Co. v. Nelson, 103 U. S. 544, 548, 549; Maxwell Land-Grant Case, 121 U. S. 325, 381, 7 Sup. Ct. 1015; Howland v. Blake, 97 U. S. 624, 626; Insurance Co. v. Henderson, 32 U. S. App. 536, 541, 542, 16 C. C. A. 390, and 69 Fed. 762. The judges of the national courts are not required to submit a question to a jury merely because there is some evidence in support of the case of the party who has the burden of proof; but, at the close of the evidence, it is their duty to direct a verdict for the party who is clearly entitled to it, when it would be their duty to set aside a verdict in favor of his opponent, if one were rendered. At the close of the evidence there is always a pre-

liminary question for the judge, before the case can properly be submitted to the jury; and that question is not whether there is literally no evidence, but whether there is any substantial evidence, upon which the jury can properly render a verdict in favor of the party who produces it.    Commissioners of Marion Co. v. Clark, 94 U. S. 278, 284; North Pennsylvania R. Co. v. Commercial Nat. Bank of Chicago, 123 U. S. 727, 733, 8 Sup. Ct. 266; Delaware, L. & W. R. Co. v. Converse, 139 U. S. 469, 11 Sup. Ct. 569; Laclede Fire-Brick Manuf'g Co. v. Hartford Steam-Boiler Inspection & Ins. Co., 19 U. S. App. 510, 515, 9 C. C. A. 1, 4, and 60 Fed. 351, 354; Gowen v. Harley, 12 U. S. App. 574, 585, 6 C. C. A. 190, 197, and 56 Fed. 973, 980; Motey v. Granite Co., 36 U. S. App. 682, 686, 20 C. C. A. 366, 368, and 74 Fed. 155, 157.

These are unquestioned rules of law and practice.    In the case at bar, the written contract of release was on its face a complete bar to this action.    The most important question in this case is, did the defendant in error produce such clear, convincing, and unequivocal evidence that his signature to this release was procured by artifice, deceit, or mistake, that the jury could properly find that fact?    There was certainly no evidence which, under the law, would warrant the avoidance of this contract on the ground of mistake.    If, as Belliwith testifies, he could not read or write; if, as he says, the contract was not read to him, and he did not know its contents,—that was the result of his own gross negligence; for he testified himself that he did not ask anyone to read it to him, and he said that he signed it under the supposition that it was the release of his claim for $4.11 for the loss of a package.    Fifty pages of his printed testimony demonstrate the fact that he knew perfectly well the difference between his claim for personal injuries and his claim for the lost package, and that, if the release had been read to him, he could not have failed to understand its effect.    He was willing to receive, and did receive, the $300 for this release, without reading it or hearing it read; and he cannot be, and ought not to be, now heard, while he retains its benefits, to say that his own ignorance and negligence exempt him from its obligations.    If, on the other hand, the release was read to him, as his attorney and the attorney of the company testify, he signed it with full knowledge of its contents, and is, of course, bound by it.    Moreover, whether it was read to him or not, he was charged with knowledge of its contents when he signed it, because the testimony is clear and uncontradicted that his attorney, whom he had authorized by a written power of attorney to compromise this claim for him, read the release, understood its contents, signed Belliwith's name to it while the latter touched the pen, received the $300, and divided it between himself and his client.    Under the law, the knowledge of this attorney was the knowledge of the defendant in error.    Nor was there any evidence upon which a finding that this release was procured by artifice or deceit can be lawfully sustained for a moment.    The fact that, as we have seen, the plaintiff was charged under the law with full knowledge of the contents of this agreement, is itself fatal to this claim, for there could be no deceit where there was no ignorance and no concealment.    It is true that Belli-

with testified that he was told by his attorney that the release evidenced a settlement of his claim for $4.11, only, and that he supposed this to be true when he signed the contract. But the solemn, written agreements of men cannot be whistled down the wind by the testimony of one of the parties to them to such a story as this, in the teeth of the power of attorney he executed, and his own testimony that he had employed his lawyer to prosecute and settle this claim for personal injuries; that his attorney had reported to him the day before his settlement that Mr. Wilson offered him $300 for the release of this claim, and that he replied that he did not want it, because they told him that its receipt would settle his demand; that Mr. Wilson made him the same offer the next day, and he then knew that, if he took it, its acceptance would constitute a settlement, and told Mr. Wilson that he did not want it; that he knew when the money was paid to his attorney that there was more than $4.11; that he knew when he got home on that day that he had received $200; and that this $200 was a present to him from the company, and so he kept it, and used it at his home. In view of this testimony, and the facts that this settlement was made in the presence of the defendant in error, by his chosen attorney, after a negotiation which continued through several days; that he was charged, under the law, with knowledge of the contents of the release he signed; that he took and used the proceeds of the settlement, and has never offered to return them, —the evidence in this case comes far short of that clear, convincing, and unequivocal proof which would warrant either a jury or a court in finding either mistake, fraud, or deceit in the execution of this contract, and the court below was in error when it refused to instruct the jury to return a verdict for the company.

In the consideration of the sufficiency of the evidence to warrant the verdict, we have not referred to the testimony of Kort and others that Poole told him six months after this release was executed that the company had never made any general settlement with Belliwith, but had given him a little money—a few hundred dollars—to help him out, because, in our opinion, that testimony was incompetent, and should not have been received by the court or considered by the jury. This statement of Poole was not admissible in evidence as an admission of the company, because, although Poole was its claim agent, and may have been empowered to settle claims against it, there is no evidence in this record that he had any authority to abrogate settlements which the general counsel of the company had made, or to admit on behalf of the company that such settlements had not been made. He was not present on the day when Mr. Wilson closed the negotiations, made the settlement, and obtained the release of this claim of the defendant in error, and he could have known what was said and done on that day by hearsay only. The company, so far as this record shows, had never delegated to him the power to admit that the settlement which Mr. Wilson had made had not been made, and it required a special delegation of such a power to authorize the destruction of the contract of release by any such admission. The testimony of Kort and others was therefore not competent as evidence of an admission of the company. Nor was it admissible as proof of

a verbal act, which was a part of the res gestæ. The statement of Poole was not made at or near the time when the act to which it refers was done. It was not made until about six months after the event which it describes had happened, and it was a mere narration of this past event, founded, not on what Poole saw or heard at the time, but on what some one else had told him that he saw or heard. This statement was entirely detached from any material act that is pertinent to the issue in this case, and was itself nothing but hearsay. Insurance Co. v. Mosley, 8 Wall. 397, 405, 416; Vicksburg & M. R. Co. v. O'Brien, 119 U. S. 99, 104, 105, 7 Sup. Ct. 118; Association v. Shyrock, 36 U. S. App. 658, 667, 20 C. C. A. 3, 8, and 73 Fed. 774, 778. The testimony of Kort was therefore hearsay repeating hearsay, and it should have been rejected.

It is assigned as error that the court refused to give to the jury the following instruction:

"If you find that the plaintiff, after going round to the east gap, where he understood he was to wait for the incoming train, from motives of curiosity, or for his own pleasure, went much nearer the burning tank, and was injured by reason of so doing, he cannot recover; and you are to consider, in that connection, whether the reason which he now gives for going back is truthful, or whether it is a mere subterfuge to excuse his conduct."

With the exception of that part which relates to the reason which Belliwith gave for going back, this is substantially the same instruction which we held in Chicago, St. P., M. & O. Ry. Co. v. Myers, 25 C. C. A. 486, 80 Fed. 361,—a case arising out of the same accident,—should have been given. Our reasons for this view, and some of the authorities which support it, will be found in Judge Thayer's opinion in that case, and will not be repeated here. Belliwith testified that he went back towards the burning tank to get a package that he had left in the passenger car which he had occupied on his way from Minneapolis. Several witnesses, however, testified that he had told them at various times that he went back to find his handkerchief, which he discovered he had lost from his pocket. In view of the testimony of these witnesses, and the general character of the evidence given by Belliwith, we think the latter part of this request was not objectionable, and are of the opinion that the entire request should have been given, if the case was to be submitted to the jury at all.

There are other assignments of error in this record, but the questions which they present are not likely to arise again in the case, and no good purpose would be served by discussing them. The judgment below must be reversed, with costs, and the case must be remanded to the court below, with directions to grant a new trial; and it is so ordered.