### GREAT NORTHERN RY. CO. v. KASISCHKE.

(Circuit Court of Appeals, Eighth Circuit. October 8, 1900.)

#### No. 1,345.

1. MASTER AND SERVANT—DEFECTIVE APPLIANCES—QUESTIONS FOR JURY.

    A railroad coal shed was equipped with boxes or chutes holding about five tons each, which, on being tripped, slid out over a tender, when the pulling of a pin permitted an apron to drop, and the coal was discharged into the tender. On one occasion one of the chutes failed to slide out on being tripped, and plaintiff, an employé, was directed by his foreman to stand on the tender and pull on it. It suddenly slid out, knocking plaintiff into the tender, and the apron fell, dumping the entire contents upon him, and causing his injury. There was evidence tending to show that 10 days after the accident only 1 of the 12 chutes in the shed would operate properly, and as they were designed to operate, and evidence was also introduced by defendant to the effect that they were inspected daily. *Held*, that such evidence warranted the submission to the jury of the questions whether the chute was in proper repair, and, if not, whether defendant knew or should have known its defective condition.

2. SAME—ASSUMED RISK.

    In such case plaintiff must necessarily have known that from some cause the chute did not slide properly, and must be held to have assumed the risk therefrom; but that fact would not warrant the court in holding, as a matter of law, that he also assumed the risk from the defective fastening of the apron, by reason of which the coal was prematurely discharged upon him, or preclude a recovery for injuries caused thereby, and in the absence of evidence clearly showing that he had, or should have had, knowledge of such defect, that question was one for the jury.

3. RELEASE—VALIDITY—PROCURING BY DECEIT.

    Plaintiff received quite severe injuries while in the employ of the defendant railroad company. A few days afterwards he signed a release of all claims for damages on account of such injury, for the stated consideration of "medical attention." He testified that he was sent for by the foreman and asked to sign the paper, and on his stating that he could not read or write English the foreman read the release to him, and

told him the company would pay his doctor bill and give him a light job; that he supposed that to be the purport of the paper, and did not understand it to be a release of his claim for damages, or he would not have signed it. *Held* that, under the circumstances, plaintiff had the right to rely upon the foreman for an explanation of the meaning and effect of the paper, and if he was misled as to its effect by the statements of the foreman, without negligence on his part,—which was a question for the jury,—it would not be binding upon him.

Sanborn, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the District of North Dakota.

C. Wellington (W. E. Dodge, on the brief), for plaintiff in error.

G. W. Freerks (M. C. Freerks, on the brief), for defendant in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

THAYER, Circuit Judge. This action was brought by Carl Kasischke, the defendant in error, against the Great Northern Railway Company, the plaintiff in error, to recover damages for certain personal injuries which he sustained at Breckenridge, Minn., while he was in the employ of the defendant company, and was engaged in coaling one of its engines. It appears that, when an engine desired to take coal at the place where the accident occurred, it was run alongside of a building or shed containing coal, and that the coal was dumped into the tender by means of movable chutes or boxes in the side of the building, which were so arranged that they would slide out of their own weight, and discharge, respectively, about five tons of coal into the tender. These boxes were so arranged that they could be made to slide out of their sockets by pulling a rope, and when they had slid out a certain distance the coal which they contained could be dumped into the pit of the tender by drawing a bolt or pin, and permitting an apron or door at the front end of the box to open or fall. The plaintiff below alleged, in substance, that on the night of December 7, 1898, he was directed by his foreman to assist in coaling one of the defendant company's engines at its coaling station; that he was ordered by the foreman to stand on the locomotive tender and pull on one of the coal chutes, so as to make it slide out of its socket; that he obeyed this order, and that while in the act of pulling on the chute it suddenly slid out of its socket, thereby throwing him to the bottom of the tender, and precipitating upon him about five tons of coal. He further alleged, in substance, that the injuries which he sustained by reason of the accident were due in part to the negligence of the defendant company in failing to provide safe machinery for dumping coal, and to the faulty and defective construction of such machinery. There was a verdict and judgment in favor of the plaintiff below for a moderate sum, to wit, $1,250, considering the nature and extent of the injuries which he is shown to have sustained. We are asked by the defendant company to reverse this judgment for various reasons.

It is claimed in the first place that no evidence was introduced which tended to show that the coal chute in question was defective in any respect, and that the verdict is without any substantial evi-

dence to support it, but a careful perusal of the record has served to convince us that this proposition is untenable. The testimony shows that the coal chutes or boxes, 12 in number, were made of sheet iron, and, if in a perfect state of repair, that they would slide out of their sockets of their own weight, by pulling a rope, or tripping them, and that they were designed to be operated in that manner, rather than by pushing or pulling them; also, that the doors or aprons of the boxes would remain closed and retain the coal until a bolt or pin was drawn, so as to release a latch which held the aprons. For some reason, however, one of the chutes (that which occasioned the injury) did not operate on the occasion of the accident as it was designed to operate. It did not slide out of its own weight when it was tripped; and, because it failed to operate as it should have done, the plaintiff was directed to stand on the tender and pull outwardly on the box with as much force as he could exert. Moreover, when the box slid from its socket it did not retain the coal, as it should have done, until the bolt was drawn and the latch released, but immediately discharged its contents into the pit of the tender, thereby covering the plaintiff's body with five tons of coal. We think that the fact that the chute, although handled properly, did not operate as it should have operated, warranted an inference by the jury that it was for some reason out of order and in need of repair. Besides, there was direct evidence on the part of one of the plaintiff's witnesses (a witness by the name of McColm), who had abundant opportunity to examine the chutes, that about 10 days after the accident none of them but one were in such a condition, owing to some defect in the pins or latches which controlled the aprons, that they would retain the coal and prevent it from dumping prematurely, while there was no testimony that during the intermediate period any unexpected event had occurred which had put them out of repair suddenly. We conclude, therefore, that a jury could properly find that the particular chute which was being operated at the time of the accident was then out of repair, and that the defect in question contributed directly to the plaintiff's injury.

It is furthermore urged that, although the chute where the accident happened may have been defective, yet the burden was on the plaintiff to show that the defendant company had knowledge of its condition prior to the accident, and that the plaintiff himself had no such knowledge. It is said that the record contains no evidence tending to show such knowledge on the part of the defendant company, while it does appear that the plaintiff himself was advised of the defect of which he now complains. We are willing to concede that it was incumbent on the plaintiff to satisfy the jury by competent evidence that the defendant knew or ought to have known before the accident that the chute was out of repair, provided it had been constructed properly in the first instance, and had become defective solely through use. We think, however, that there was some evidence which would justify a jury in concluding that the chute had been out of repair for some time prior to December 7, 1898, and that its condition ought to have been known to the defendant company, or to the person whose duty it was to inspect these chutes.

We have already referred to the fact that there was testimony to the effect that about 10 days after the accident all of the chutes but one were out of repair, and would not operate as they should have done, owing to some defect in the latches which were designed to hold the aprons in place. The defendant claimed, and offered evidence to that effect, that the chutes were inspected daily, and were in perfect order on the evening of the accident, and for a long time afterwards. The jury probably credited the statement of the plaintiff's witness McColm that all of the 12 chutes, with possibly one exception, were in a defective condition very shortly after the accident; and, upon the assumption that they were convinced of this fact, it afforded a reasonable basis for an inference that the chutes, or some of them, were out of repair on the night of the injury and for some time previous, inasmuch as it did not appear that anything had happened in the meantime that would be liable to disarrange all of the chutes in that brief period. If, a week after the plaintiff was hurt, the chutes, with one exception, were out of order, and in need of repair to make them operate perfectly, or as they were designed to operate, it would be reasonable, we think, to conclude that some of them were in need of repairs previous to December 7, 1898, and that the defect should have been discovered by the defendant company, since the testimony which it produced tended to show that they were subjected to a daily examination. We think, therefore, that no error was committed by the trial court in allowing the jury to determine whether the chutes were in a defective condition on the night of the accident, and whether the defect therein was of such long standing that the defendant company, in the exercise of ordinary diligence, ought to have discovered their condition. In view of the conflict in the testimony respecting the condition of the pins and latches by which the aprons were held in place, it was the province of the jury to settle the controversy; and, if they found the chutes to be in a bad state of repair on the occasion of the accident, it was likewise their duty to determine for how long a period they had probably been in that condition, and whether reasonable care had been exercised by the defendant. It is a fact which admits of no controversy that when the plaintiff took his place on the tender, in obedience to the order of his foreman, for the purpose of pulling on the coal chutes or boxes, he was aware that for some reason the particular chute did not operate as it should have done when the rope was pulled, and that there was something which obstructed its outward movement. But it will not do to say that the testimony shows beyond peradventure that the plaintiff was aware that there was a defect in the pin or latch of the apron of the chute which he attempted to draw, which would cause it to dump prematurely. He testified, in substance, that he had only assisted in coaling engines at the coal chute in question for two nights prior to the accident, and that during that time he had learned that some of the aprons were open, but that the pins in most of them were so tight that they had to be knocked out with a pick. This statement did not warrant the trial court in assuming that the plaintiff knew that the apron of the chute which he attempted to draw was in such

a condition that it would open of its own accord, but it rather made it the duty of the court to permit the jury to determine whether he had such knowledge, or ought to have acquired it, prior to the accident. It was the province of the jury to decide what knowledge he had or ought to have had as respects the condition of the apron, and whether it was of such a nature as rendered him guilty of contributory negligence. It may have been, and probably was, a defect in the apron fastenings of the particular chute which he attempted to draw, occasioning an unexpected fall of a mass of coal upon the plaintiff's body as he lay in the pit of the tender, that caused his most serious hurt, namely, the rupture of which he now complains. In view of all the testimony, the trial court had no right to declare that the plaintiff had consciously assumed the risk of being crushed or bruised by the sudden fall of five tons of coal, even if it did appear that he had consciously assumed the risk of losing his balance on the edge of the tender by the sudden outward movement of the chute. Most men in his situation, and without knowledge that the apron of the chute was out of order and that it would discharge its load prematurely, would probably have obeyed the peremptory order of the foreman (which was given, as it seems, with some show of anger) to stand on the tender and pull on the chute, and would have done so without hesitation or thought of serious harm. We are not prepared to hold, therefore, and cannot assent to the proposition, that because he attempted to start the chute by pulling on it, knowing that it was obstructed by some obstacle, he thereby assumed the risk of an injury that was occasioned by an unknown defect in the apron, and is not entitled to recover for such injury. The evidence shows that there was another risk besides that of slipping into the pit of the tender, of which he may have been ignorant, that may have occasioned his chief hurt, and that this risk was incurred through the fault of the master. We are of opinion that the trial court very properly allowed the jury to determine, in the light of all the circumstances, whether the plaintiff was guilty of such contributory negligence in obeying the order of the foreman, and in taking such a position as he did on the tender, as should preclude him from recovering.

It is further urged by the defendant company that the plaintiff on December 12, 1898, for a valuable consideration, released it from all causes of action then existing, and that this action is barred by the release, which is in the following form:

"Form 2,704. Great Northern Railway Line. Great Northern Railway Company. Release of Damages.

"Know all men by these presents, that in consideration of the sum of medical attention ——, to me in hand paid by the Great Northern Railway Company, the receipt whereof is hereby acknowledged, I have released, acquitted, and discharged, and by these presents do release, acquit, and forever discharge, the said railway company, its successors and assigns, of and from any and all cause or causes of action, costs, charges, claim, or demand, of whatever name or nature, in any manner arising or to grow out of personal injuries received by me at Breckenridge on Dec. 6th, 1898, while assisting in coaling engine No. 200. I slipped and fell into tank pit, and coal from pocket fell on me, whereby I was severely injured. The receipt of said sum of medi-

cal attention dollars being hereby acknowledged to be in full payment, satisfaction, and discharge of any and all such cause or causes of action, costs, charges, and demand arising or growing out of said personal injuries received as aforesaid.

"In witness whereof, I have hereunto set my hand and seal this 12th day of December, A. D. 1898.                                    Carl Kasischke. [Seal.]

"In presence of
    "J. C. Nolan,
    "E. Abig."

Along the margin of this release was written the following statement, but it was unsigned:

"This release read and explained to me before signature, and releases all claims for personal injury to date."

With respect to this document the plaintiff testified, in substance, that on December 12, 1898, five days after the accident, he was sent for to come to the roundhouse; that he was somewhat affected by dizziness at that time, as a result of the accident; that on reaching the office in the roundhouse he was shown a paper by the division master mechanic, J. C. Nolan, and was asked if he understood it; that he told Nolan at the time that he could neither read nor write English; that Nolan then read the paper to him, but that he did not understand it fully or accurately; that, in the course of the conversation which ensued about the paper, he told Nolan that his doctor had asked him that morning for a dollar, and that Nolan replied, "The company will pay your doctor bill and give you a light job." He further testified, in substance, that Nolan did not explain to him that the document was intended as a release of his claim for damages on account of the injury that he had sustained; that he did not understand it to be an agreement of that nature, but did suppose that it was an engagement on the company's part to pay his doctor and give him a light job, because Nolan said they would do so when he was asked to sign the document. He also testified that the interview with Nolan, when the paper was signed, lasted only five or ten minutes; that no money was paid to him at that time or afterwards; that nothing was said about paying him any money; that he ascertained the real purport of the writing after it was signed, through a conversation with some of his fellow workmen, and that he would not have signed the paper had he known it to be a release of all claims against the company for being injured. The evidence for the defendant with respect to this transaction was, as a matter of course, entirely different, and tended to establish that the release in question was not only read by Nolan, but that the object thereof was fully explained to the plaintiff before it was signed, and that he executed it with a full knowledge of the language employed, even if he did not comprehend its legal effect.

It was clearly the duty of the master mechanic, when he was informed that the plaintiff could not read or write English, and that he relied upon him for an explanation of the contents of the paper, to explain its purport and the object of asking him to sign it, and to do so fully, in language which the plaintiff could comprehend. Because Nolan represented the defendant company in the transaction, it was his duty to exercise special care in explaining its contents to

the plaintiff. It was likewise the plaintiff's duty to make reasonable efforts to obtain a correct understanding of the document before he signed it, and not to sign it until he had reasonable grounds for believing that he did understand it. Railway Co. v. Belliwith, 28 C. C. A. 358, 83 Fed. 437. We think, however, that the plaintiff had a right to rely upon Nolan for an explanation of the meaning and effect of the paper, inasmuch as he assumed the duty of interpreting and explaining it, and that the plaintiff was not bound to seek other advice on the subject. The result is that if Nolan, by his statements or conduct, misled the plaintiff in any manner as to the effect of the instrument and induced him to believe that it was merely a writing by which he was to have his doctor's bill paid and get a light job, and that it was not in fact a release of his cause of action, it ought not to stand or be accepted in the present action as a bar to a recovery. The contention of the defendant company is that there was no evidence whatsoever which tended in any way to impeach the validity of the release, and that the court should have so declared. But, in the light of what has been said, we are unable to assent to that proposition. In the first place, the consideration recited in the release as moving from the defendant company, to wit, "medical attention," was trifling in comparison with the permanent bodily injury which the plaintiff appears to have sustained; and this in itself raises a suspicion of unfairness, and gives color to the claim that the plaintiff was in some way deceived, and did not understand that he was releasing his right of action. Aside from this view are the positive statements of the plaintiff that he was not advised that the instrument was intended as a release of his claim for damages; that he would not have signed it had he understood such to be the object of asking his signature; that statements or representations were made by Nolan, which are not embodied in the document, that gave him a different understanding of its purpose; and the obvious facts that the plaintiff was to some extent subject to the influence of his superior officer, and had a very imperfect knowledge of the language in which the paper was written, and in which the negotiations leading to its signature were conducted. These considerations, in our opinion, warranted the trial court in permitting the jury to determine whether the plaintiff had consciously released his right of action, or whether his signature to the release had been obtained by conduct or representations on the part of the company's agent which amounted to deceit. While it is essential to the public welfare that the integrity of written contracts should be maintained, by requiring the parties thereto, before they sign the same, to exercise reasonable diligence in acquiring a correct knowledge of their meaning and effect, yet it is equally important that the rule of law in this respect should not be applied with such strictness as will enable persons who are so disposed to easily overreach those who are unlettered and unwary, and deprive them of valuable rights. In this instance we are satisfied that it was the function of the jury to decide whether the plaintiff was deceived as to the contents of the release, and also to determine whether he was guilty of any such negligence in execut-

ing it, under the circumstances disclosed by the proof, as should estop him from contesting its validity.

The foregoing comprehends all of the substantial grounds on which the right to a reversal is predicated, and, for the reasons stated, we think that none of them would warrant such action. The judgment below is accordingly affirmed.

SANBORN, Circuit Judge. I am unable to yield assent to the opinion and decision of the majority of the court in this case, because it seems to me that the undisputed evidence shows that the injury which the plaintiff sustained was the direct result of his own contributory negligence, and because, if he had any claim against the railroad company, he released it.

The uncontradicted evidence is that the theory of the construction and operation of the boxes containing the coal was that they should hold the coal after they were drawn out to the engine, until the pins were drawn and the aprons were released by the operator. The testimony is equally conclusive and uncontradicted, however, that these boxes never did in fact so operate, but that when they were in perfect condition the pins and aprons would not hold the coal after they were drawn forward to the engine, and they would frequently automatically dump it, so that it was always dangerous for an employé to be in front of them when they were drawn forth. There is a conflict in the evidence respecting their condition at the time of the accident. The testimony for the defendant is that they were in order. The plaintiff himself testified that some of them opened themselves before and at the time of the accident, but that it was necessary to open most of them with a pick; and one of his witnesses testified that ten days after the accident all but one of them were so out of repair that they would dump the coal automatically. The opinion of the majority assumes that the condition of the boxes at the time of the accident was that described by this last witness. If this was their condition at the time of, it had undoubtedly been their condition for at least four days before, the accident. The evidence is uncontradicted that the plaintiff assisted in coaling the engines only when the boxes would not slide out by the use of the rope, and that he had assisted in pulling these coal boxes out and in coaling the engines from them for the four nights immediately preceding the accident, and that he had done so 7 or 8 times each night, or from 28 to 32 times. He testified himself that during this time some of these boxes opened themselves, and that some of them they were compelled to loosen with a pick. Now, if, as the majority of the court assume, all the boxes but one dumped automatically at the time of the accident, because they were out of repair, the plaintiff must have known that fact, and he must have been aware of the risk and danger of placing himself in front of them. On the other hand, if they were in order, and if, as the uncontradicted testimony proves, they frequently dumped automatically when they were in perfect repair, so that there was always danger that they would do so, he must have known this fact. Whichever view of the testimony is taken, therefore, he was assisting to operate these boxes, and his opportunity to know and his

knowledge of their condition and operation, and of the risk and danger attending their operation, were necessarily better and more intimate than any that the defendant could acquire by a diligent inspection; and if, upon this testimony, the defendant could be guilty of negligence because it might have learned by inspection that the boxes were out of repair, much more was the plaintiff guilty of contributory negligence because he had the best opportunity to learn, and he himself testifies that he did know, that they dumped automatically, and knowing this he must have known the risk and danger of placing himself in front of one of them when he was pulling at its door with all his power. It was gross negligence for the plaintiff to permit himself, with this knowledge, to be found in front of the door of one of these boxes when it was about to be drawn forth to its dumping place. If he had not so placed himself, he would not have been injured. The result is that his accident was necessarily the direct result of his own negligence, for which the defendant was not liable, and the judgment against it should be reversed.

Nor am I willing to assent to the proposition that there was sufficient evidence of misrepresentation, fraud, or deceit in procuring the release which the plaintiff executed to warrant its avoidance. If the testimony of one of the parties to a written contract, who did not read it, or procure any friend or disinterested person to read or explain it to him, but to whom it was read and explained by the agent of the other party, that he did not know its purport or that he was deceived in its terms, is to be deemed sufficient to set it aside, when that testimony is contradicted by all the other witnesses to the transaction, written agreements will not only lose their sanctity, but their reason for being. It is a settled rule of law that written contracts may not be set aside or disregarded for fraud or deceit in their procurement unless the evidence of the fraud or mistake is clear, unequivocal, and convincing. In my opinion, the evidence in this case was not only not clear and convincing that there was fraud and deceit, but it was unequivocal and overwhelming that there was none. The story of the plaintiff is incredible in itself. It is that he did not know that the instrument he signed was a release of his claim, but that he supposed that it was a mere agreement on the part of the railroad company to give him a light job and pay him his doctor's bill. But the company needed to make no agreement to enable it to do these things, and the plaintiff must have known that his signature was not sought without purpose or reason. He does not claim that Nolan, who read the agreement to him, told him that the contract stipulated that he should have a light job. He admits that Nolan read the contract to him, and he simply claims that Nolan told him that he should have a light job, and the payment of his doctor's bill. If this testimony was true, his remedy was not an avoidance of his agreement, but an action for damages for the failure to give him the job, and to pay him his doctor's bill, if indeed there was such a failure. There does not seem to me to be sufficient proof of fraud or deceit in the testimony of the plaintiff, standing alone, to warrant an avoidance of his release. But it does not stand alone. Nolan, who read the agreement to him, testifies that he read it in full and clearly

explained it, that he told him that it was a release of his claim against the defendant, and that he made no misrepresentation to him of its contents. Abig, the witness to the contract, testifies that, when Nolan read it to the plaintiff in English, the latter said that he understood it, but that, for fear that he might not fully understand it, he explained it to him in German. He testified that he said to him in that language, "Charley, by signing this paper you release the company of any further claim on account of this damage," and that the plaintiff replied, "Yes, yes, yes, I understand," and thereafter executed the release. When the attention of the plaintiff was called to this conversation in his testimony in rebuttal, he did not deny it. He merely said he did not remember it. In this state of the record, there seems to me to be not only no evidence which would warrant a jury in finding that this release was procured by misrepresentation or deceit, but conclusive proof that it was not so obtained, and the court below should have so instructed the jury. The case falls fairly under the decision of this court in Railway Co. v. Belliwith, 83 Fed. 437, 28 C. C. A. 358, 55 U. S. App. 113, where my views of the law upon these questions and the importance of its enforcement are expressed more forcibly and more at length.