# BALTIMORE & OHIO RAILROAD COMPANY *v.* MORGAN.

TRIAL; INSTRUCTIONS TO JURY; NEGLIGENCE; AGGRAVATION OF INJURY; RELEASES; EVIDENCE; CONTRACTS; PHYSICIANS AND SURGEONS.

1. A proper instruction to the jury may cure an improper one, where the correct one explains away the defect in the improper one; but when two instructions, one proper and the other improper, are in direct conflict, a correct statement of the law in one does not cure the error in the other.

2. Where a disease or affliction from which a person is suffering is aggravated or increased by an injury caused by the negligence of another, the injured person can recover only for the aggravated or increased sufferings that are the natural and proximate result of the negligent act; and an instruction in an action for an injury, under such circumstances, which in effect permits the jury to award to the plaintiff damages to the full extent of her present condition, although the negligent act complained may have contributed only in part in producing such condition, is erroneous.

3. A release by an injured person of his claim for damages against another whose negligence is alleged to have caused the injury is valid and binding, where the minds of the parties have met as to all matters involved in the settlement, and the release has been procured without fraud, misrepresentation, or mistake; but where, in an action for an injury, the defendant relies upon such a release to bar the plaintiff's right to recover, and there is evidence tending to show that the release was obtained through false representations or by statements which led the plaintiff to sign it in the belief that it was for another purpose, the issue raised is one for the jury.

4. Where one signs a written contract without reading it, his failure to read it is such gross negligence that it will estop him from denying the contract, unless he has been dissuaded from reading it by some trick or artifice practised by the other party.

5. Where the evidence of the plaintiff, a woman, in a personal injury suit against a railroad company, in which the defendant claims that a release signed by her constituted a bar to her recovery, tends to show that she signed it the morning following the accident, when she was in a nervous, excited condition, suffering from her injuries, and that the statements by the defendant's claim agent at the time caused her to believe that she was signing a receipt for compensation for her damaged wearing apparel and her loss for time, the question whether the minds of the parties met upon a settlement of the claim for damages for personal injuries is one for the jury.

6. The plaintiff in a personal injury suit, by producing physicians who testify in her behalf as to her physical condition at the time of an examination made by them some two years after the injury complained of, does not waive the right, under D. C. Code, sec. 1073 [31 Stat. at L. 1358, chap. 854], prohibiting a physician, without the consent of the patient, from disclosing any confidential information acquired while professionally attending the patient, and which was necessary to enable him to act in that capacity, to object to the testimony of a physician produced by the defendant, as to the result of an examination made by him of the plaintiff at a different time, where she has not only not testified as to the result of such examination, but has denied that it was made, or that the physician ever attended her professionally.

No. 2086.  Submitted March 1, 1910.  Decided May 10, 1910.

HEARING on an appeal by the defendant from a judgment of the Supreme Court of the District of Columbia, on verdict, in an action to recover damages for personal injuries.

*Reversed.*

The COURT in the opinion stated the facts as follows:

This suit was brought by the appellee, Helen Gould Morgan, in the court below, to recover damages for personal injuries received while a passenger on the train of the appellant, the Baltimore & Ohio Railroad Company. It appears that on the 7th day of December, 1904, the appellee was a passenger on one of the trains of the Baltimore & Ohio Railroad Company, coming from Rockville, Maryland, to the city of Washington. After the train had reached this city, and while it was being backed

into the depot, the rear car of the train was propelled against the bumper or stop block, with considerable force. When the train struck the obstacle, the appellee was standing in the aisle of one of the passenger coaches, near the forward end of the car, as it approached the depot. When the train struck the block, she was thrown forward through the open door of the car and against the iron guard rail of the platform, striking her left side against the railing, just over the abdomen. For the injuries alleged to have been received, this suit was brought, and, on trial, a judgment was rendered in her favor, from which the case comes here on appeal.

*Mr. George H. Hamilton, Mr. Michael J. Colbert, Mr. John W. Yerkes,* and *Mr. John J. Hamilton* for the appellant.

*Mr. John C. Gittings, Mr. Frank D. Blackistone,* and *Mr. Justin Morrill Chamberlin* for the appellee.

Mr. Justice VAN ORSDEL delivered the opinion of the Court:

Numerous assignments of error are presented by counsel for the appellant company, but we think that the consideration of all of these assignments will not be necessary for the purpose of disposing of this appeal. At the request of the defendant in the court below, the court instructed the jury as follows:

"3. The jury are instructed that the plaintiff is not entitled to recover damages in this action for any pain or suffering endured by her, or any physical disability received by her, from any other cause than the blow alleged to have been sustained by her while a passenger on the defendant's train on the 7th day of December, 1904."

"5. The jury are further instructed that if they find, from all the evidence, that the mass or clot located upon or near the fallopian tube and ovary of the plaintiff was caused by an extra-uterine pregnancy, or from some infectious disease, and was not the result of any blow received by her while she was a passenger upon the defendant's train on the 7th day of De-

cember, 1904, then the jury are not at liberty to award the plaintiff any damages whatever in respect of such mass or clot."

On behalf of the appellee, plaintiff below, the court granted the following instruction:

"4. If the jury find from the whole evidence that the plaintiff, at the present time, is suffering from diseased ovaries, which disease and suffering can only be arrested by an operation that will require the removal of both ovaries and both tubes, or either of them, then they are instructed, as a matter of law, it is absolutely immaterial whether such diseased condition of the ovaries and tubes was brought about by a tubal miscarriage or an internal hemorrhage, provided you shall further find from the evidence that the blow received by the plaintiff in the accident described in the declaration superinduced or contributed in any way to such present condition of the ovaries and tubes; and if you shall find such fact, then the plaintiff is entitled to be compensated for such condition, provided you otherwise find she is entitled to recover."

The court, on its own motion, instructed the jury as follows:

"If the jury find from the whole evidence that the plaintiff at the present time is suffering from diseased ovaries, which disease and suffering can only be arrested by an operation, that will require the removal of both ovaries and both tubes or either of them, then they are instructed, as matter of law, it is absolutely immaterial whether such diseased condition of the ovaries and tubes was brought about by a tubal miscarriage or an internal hemorrhage. It does not make any difference what the trouble is, whether tubal miscarriage, or whether it is an internal hemorrhage. Provided you shall further find from the evidence that the blow received by the plaintiff in the accident described in the declaration superinduced or contributed in any way to such present condition of the ovaries and tubes; and if you shall find such fact, that is, that this blow did superinduce or contribute to the injury, whether it was from this tubal pregnancy, or whether it was tubal miscarriage, or whether it was internal hemorrhage, it makes no difference, if it super-

induced or contributed to it; and if that is the condition, then the plaintiff is entitled to compensation; provided you otherwise find she is entitled to recover. In other words, gentlemen, putting it in another way, it does not make any difference what may be the condition of any given person, if the present condition has been caused by an injury wrought by the negligence of the defendant, then the plaintiff would be entitled to recover for that injury, if it was caused by the injury complained of, as in this case."

The vice in these instructions consists in their failure to eliminate, as an element of damage, the diseased condition of appellee which might reasonably be inferred from the evidence to have existed at and prior to the time of the accident. We are also of opinion that this defect was not cured by giving the two instructions requested by counsel for appellant. A proper instruction may cure an improper one, where the correct one explains away the defect in the incorrect one. But where two instructions, one proper and the other improper, are in direct conflict, a correct statement of the law in the one instance cannot be said to cure the error in the other. It is impossible for us, in the present case, to say which line of instruction the jury followed. That the instructions given at the request of counsel for appellee and by the court on its own motion are fatally erroneous is manifest.

The evidence touching the injury, if any, received by the appellee, consisted almost entirely of the testimony of expert witnesses,—physicians and surgeons. There is a great conflict in the testimony as to what could have caused the trouble with which appellee was afflicted at the time of the trial. The trial occurred almost four years and a half after the accident. It was shown by these witnesses that the diseased condition of appellee's ovaries and fallopian tubes, found to exist at the time of the trial, might have existed at the time of the accident; that, if it had existed, it might have been increased in its severity by the accident, or it might not have been affected by the accident; that it might have been caused indirectly by the accident; or that it might have been contracted by appellee from

causes described by the witnesses after the accident. This raised a well-defined issue of fact, which ought to have been submitted to the jury under proper instructions. If the disease existed at the time of the accident, and was not augmented nor increased in any way by reason of the accident, or if the diseased condition arose after the accident and was traceable to other causes, this condition would not constitute an element of damage. On the other hand, if the affliction existed at the time of the accident, and it was increased and augmented in its severity by reason of the accident, the proper measure of damage would be the portion or extent to which the accident contributed in bringing about the condition found to exist at the time of the trial. Of course, if the accident were the sole cause of the condition found at the time of the trial, that condition would be the proper measure of damage. The jury, however, were in effect told in the instructions presented by counsel for appellee and in the instructions given by the court on its own motion, that the blow received by appellee, if caused by the negligence of the appellant company, entitled her to recover damages to the full extent of her present condition, even though the blow only contributed to the injuries complained of, a condition which, in whole or in part, may have been produced by entirely different causes.

The law is well settled that where an accident does not cause a diseased condition, but only aggravates and increases the severity of a condition existing at the time of the accident, such party could only recover for such increased or augmented sufferings as were the natural and proximate result of the negligent act. As was said by the court in *Gulf, C. & S. F. R. Co.* v. *Brown,* 16 Tex. Civ. App. 93, 40 S. W. 608, 614: "It was proper to instruct the jury that if they should find that plaintiff, prior to his injuries, was suffering with any diseases or complaints, and should also find from the testimony that such diseases or complaints had been aggravated by the negligence of the defendant, as before explained, then plaintiff would only be entitled to recover for such increased or augmented sufferings as were caused and produced alone as the direct and proximate and consequence of the negligent acts of the defendant,

if any, as charged." In *Rock Island* v. *Starkey,* 189 Ill. 515, 527, 59 N. E. 971, the court said: "There was no instruction, however, which in any way separated or brought to the attention of the jury the rule as to the liability of the city for aggravation of previous conditions which were acknowledged to exist. If prior to the injury plaintiff had diseases which were aggravated by the fall, she might recover from the defendant; but its liability would be measured by the damages which were the natural and proximate result of its negligence. The evidence tended to show something more than a mere latent tendency to particular diseases; and if there was an aggravation of the existing diseases, the city would only be liable for what resulted from the fall." This rule is founded in justice and common sense, and has been iterated and reiterated so often that it is unnecessary to encumber this opinion with citation of authorities. The error is so fatal as to demand a reversal and the granting of a new trial.

There are other assignments of error which, in view of a probable retrial of the case, we think ought to be considered. The defendant introduced in evidence, in bar of plaintiff's right of recovery, the following release:

Received of the Baltimore and Ohio Railroad Co. the sum of Twenty Dollars in full satisfaction payment and discharge of all claims or demands which I Miss Helen G. Morgan, No. 60 C St., N. W., Washington, D. C., now have, or may or can hereafter have against said Railroad Company, or arising out of personal injury loss and damages to personal property in accident to B. and O. train No. 66 in Washington, D. C., Depot, Dec. 7th, 1904, and in consideration of receipt by me of said sum I do hereby release and forever discharge the said Company from all claims or demands, as well as from all claims or demands of any kind whatsoever.

Witness my hand and seal this 8th day of Dec., 1904.

　　　　　　　　　　　　　　　Helen Morgan (Seal.)

Witness:

William H. H. Lundy.

J. Lewis, Jr.

Contracts of this kind are held valid and binding, where the minds of the parties have met as to all matters involved in the settlement, and the release has been procured without fraud, misrepresentation, or mistake.   Where, however, there is evidence tending to show that the release has been secured through false representation, or by statements which led the party to sign the release in the belief that it was for another purpose, such fact may be shown on the trial, and the issue raised becomes one for the determination of the jury.   Where the release was signed by a person in the full possession of his faculties, the mere suppression of facts by the defendant or its claim agent will not furnish grounds for the avoidance of the contract.   It is no excuse that the plaintiff failed to read it; but when the party has been misled by alleged misstatements of the defendant or its agent, or by only a partial disclosure of the matters embraced in the release, such conduct may be shown for the purpose of avoiding the release so obtained.

It appears from the testimony of the plaintiff in the present case that, on the morning following the accident, one Lewis (the claim agent of the defendant company) called to see her.  Plaintiff testified that she had suffered with her head all night, and had a severe pain in her side.   Referring to her interview with Lewis, she testified that when he came "he said, 'I just wanted to know how much money would make you feel all right.'   I said, 'Money?   What for?'   He said, 'What about your clothing?'   I said my hat was destroyed.   He then asked me the value of the hat, and I told him it was not very much, that I had made it myself, and that probably the material cost $8.   He then said, 'You do not feel like attending to business to-day?'   I said, 'No, I do not.'   Then he said, 'Now you just better stay at home for two or three days.'   He then asked me the value of my time, and I told him it was of different value at different times of the year, that at that time it was not very much, that I valued it at $3 a day.   He arranged to leave me $18.   *   *   *   Q. After he said he would arrange to give you $18, what did he do?   A. He left the house.   Q. Did he return again?'   A. Yes, he came back in a short time.   *   *   *   I signed a receipt

for the money paid me for my hat and time. At the time I signed the paper it was resting on a table or sewing machine in the room. It is my impression that it was on the edge of the table, and that Mr. Lewis was on my left, and put his right hand across to steady the paper for me. He held it and asked me to sign there, indicating the line where I was to write. He did not tell me anything about the paper or offer to read it to me, and I did not read it."

A Mr. Lundy, who resided at the house where the plaintiff was stopping, was called in to witness the signing of the release. Referring to this the plaintiff testified: "I did not hear Mr. Lewis speak to Mr. Lundy at all except to ask him to sign the paper, and he showed him where to sign. I did not hear him say to Mr. Lundy that he was paying me for the accident, or anything of the kind. Nothing of the kind could have been said without my hearing it, as I did not leave the room. I first ascertained that the paper I had signed was a release when Mr. Kilgour called to see me several days after. Mr. Kilgour asked me about it, and I related the circumstances to him, and then he said, 'You have signed a release.' This conversation was perhaps a week after the accident, and I gave to Mr. Kilgour the $20 which Mr. Lewis had paid me." In relation to the signing of the paper, Mr. Lundy testified as follows: "Mr. Lewis did not state to me at the time I was called in to sign the paper, that he was paying Miss Morgan on account of her injuries. No one told me what it was about, and I do not know to-day what that paper was. I never read it or heard it read." At the trial this evidence was contradicted by the claim agent. It is apparent, however, that the jury must have believed the plaintiff, and found as a fact that the minds of the parties never met on the question of a settlement for damages for the injuries received.

Considerable stress is laid by counsel for plaintiff upon the fact that the railroad company's physician called upon plaintiff, and told her she was not injured, but was suffering only from a nervous shock, and would be all right in a few days. The claim agent called about fifteen minutes after the physician left, and

secured the release. While the statement of the physician that plaintiff had not sustained any permanent injuries might have tended to distract her attention from the matter of her injuries, yet it is not apparent how it could have influenced the plaintiff in signing the release, since plaintiff testified that she did not know that she had signed a release until several days later, when she was so informed by the witness Kilgour. Had she known she was signing away her right to claim damages for the injuries received, then it might be reasonably inferred that the statement of the company's physician induced her to execute the release. We think her evidence merely discloses, and it was sufficient to present an issue of fact for the jury, that what she thought she was signing was a receipt for compensation for her hat and for three days' time. This conclusion was a reasonable one for her to draw from the statements of the claim agent. Had the claim agent made no statements whatever in regard to the paper, and plaintiff, in the full possession of her faculties, had blindly and heedlessly signed it, we might be confronted with a different case. But where representations were made which were false, or which, at most, related only to part of the matters embraced in the release, the defendant is not in position to relieve itself from liability through the negligence of the plaintiff in signing the paper without reading it or having it read to her. We think this evidence presented a question for the jury to determine, as a matter of fact, whether or not there was that full and fair statement of the object of the settlement by the claim agent as fully apprised the plaintiff of the scope of the release which she was asked to sign.

A written contract is the highest evidence of its terms, and it is the duty of contracting parties to acquaint themselves with its contents before signing. The statement of one signing, in the full possession of his faculties, that he did not read it, and therefore did not know what he was signing, will not, in law, constitute an excuse. As was said in *Chicago, St. P. M. & O. R. Co. v. Belliwith,* 28 C. C. A. 358, 55 U. S. App. 113, 83 Fed. 437: "If one can read his contract, his failure to do so is such gross negligence that it will estop him from denying it,

unless he has been dissuaded from reading it by some trick or artifice practised by the opposite party." We think there was evidence tending to show that this is what happened in the present case. The plaintiff was induced to sign the paper believing that she was signing a receipt for compensation for her hat and three days' time. This case seems to come within the ruling of the court in *Union P. R. Co.* v. *Harris,* 158 U. S. 326, 39 L. ed. 1003, 15 Sup. Ct. Rep. 843, where Mr. Chief Justice Fuller, referring to the facts upon which the right of Harris to avoid a release similar to the one here in question was submitted to the jury, said: "Again he was asked: 'Were you at the time of signing that conscious that you were signing any agreement other than for your expenses of sickness and loss of time for two weeks?' and he answered: 'That is what he told me; that is just what he told me;' and that the release was not read to him by the claim agent. We do not think that any ruling in reference to this testimony can be held as substantially incorrect. The word 'conscious' related to the understanding of the witness at the time, and the question and answer are to be taken with the other testimony and the instructions in the case; and we find nothing in these particulars calculated to mislead the jury, or to be so prejudicial to the defendant as to justify complaint."

While it might be true that an experienced business man, signing under the circumstances here detailed could not subsequently avoid the terms of a release under seal by oral testimony, such as appears in this case, the court is justified in taking into consideration the fact that the plaintiff was a woman, with little experience in business affairs, called upon to sign a release the next morning after the accident, when she was in a nervous, excited condition, suffering from her injuries. While contracts such as the one here in question, when fairly and properly entered into, are commendable and enforceable, yet the duty devolves upon the railroad company, in securing such a release, to deal with the injured party with the highest degree of fairness and frankness. It is not a difficult matter for the company to protect itself against the future avoidance

of such a contract, if due care is exercised. It would be a simple matter for the agent of the company, after waiting until the injured party is in the full possession of his faculties, to take with him a notary public or sworn officer of the law, have such officer read and explain the terms of the release to the injured party, and take his acknowledgment to the same. Some such precaution as this would obviate all question as to the validity of the release. But where the claim agent seeks the injured party at the earliest opportunity, when such party is still suffering from the injuries, and, by reason of such suffering, is disqualified from transacting business, and by suppression of the facts, or by misrepresentation, misleads the party into signing a paper the contents of which are unknown to him, and by such misrepresentation induces the injured party to neglect the precaution of reading the same, the court will disregard the sanctity that usually attaches to the execution of a written instrument, and submit the entire transaction to the jury to determine the question of the validity or invalidity of the instrument.

Another assignment of error relates to the refusal of the court to allow one Doctor Mundell to testify to plaintiff's condition subsequent to the happening of the accident which, it is alleged, caused the injury complained of. Counsel submitted the following offer, which was refused by the court: "Thereupon the defendant, to further maintain the issues on its part joined, offered to recall Dr. Joseph J. Mundell, for the purpose of testifying that at the time plaintiff was under his treatment at Columbia Hospital, beginning with June 18, 1905, she did not have any lump, foreign substance or growth, adhesion, or any other trouble of either the fallopian tubes or ovaries or parts adjacent thereto, as testified by the physicians offered by the plaintiff as existing over two years after the date of the accident."

Sec. 1073 of the Code of the District of Columbia [31 Stat. at L. 1358, chap. 854] is as follows: "In the courts of the District of Columbia no physician or surgeon shall be permitted, without the consent of the person afflicted, or of his legal representatives, to disclose any information, confidential in its nature,

which he shall have acquired in attending a patient in a professional capacity, and which was necessary to enable him to act in that capacity: *Provided* that this section shall not apply to evidence in criminal cases, where the accused is charged with causing the death of or inflicting injuries upon a human being, and the disclosure shall be required in the interests of public justice."

It appears that plaintiff produced as witnesses on her behalf two physicians, who testified as to her condition at the time they examined her, some two years after the accident. It is insisted that plaintiff, by producing these witnesses to testify as to her condition, waived the right to object to the evidence of the witness Mundell, who had made a similar examination at a different time. We think the objection was properly sustained. We understand the rule in relation to the admission of evidence of this character, under statutes similar to ours, to be that waiver of the right can only be claimed where the party testifies to the result of a particular examination, in which case the opposing party may call the physician who made the examination to corroborate or deny the statements made by the party; or where two or more physicians in consultation examine into the physical condition of the party, when, if one of the physicians is called by such party to testify to the results of the examination, another physician present and taking part in the examination may be called by the opposing party to testify in relation thereto. But if the physician whose evidence is sought to be introduced by the opposing party made his examination at a different time from that testified to by the physician introduced, and the party has not testified to the results of such examination, the evidence is inadmissible. *Citizens' Street R. Co.* v. *Shepherd,* 30 Ind. App. 193, 65 N. E. 765; *Penn. Mut. L. Ins. Co.* v. *Wiler,* 100 Ind. 92, 50 Am. Rep. 769; *Record* v. *Saratoga Springs,* 46 Hun, 448, approved in 120 N. Y. 646, 24 N. E. 1102. In the present case, the plaintiff not only did not testify in relation to the examination alleged to have been made by the witness Mundell, but positively denied that such an examination

had ever been made, or that the witness had ever attended her in a professional capacity.

We think that, under the strict terms of the statute, the evidence here sought to be adduced was highly privileged, and no error was committed in sustaining an objection to its admission.

For the error pointed out, the judgment is reversed, with costs, and the cause remanded, with instructions to grant a new trial.                                          *Reversed.*

A petition by the appellee for a rehearing was overruled June 1, 1910.