## THE CITY OF ROCK ISLAND

*v.*

## BELLE STARKEY.

*Opinion filed February 20, 1901—Rehearing denied April 5, 1901.*

1. EVIDENCE—*when defense is entitled to call witnesses in sur-rebuttal.* In an action against a city for injury to plaintiff, which, it is claimed, caused paralysis in plaintiff's leg, where plaintiff's witness, called to rebut testimony that a certain condition of the leg was inconsistent with ordinary paralysis, testifies that such condition was consistent with a form of paralysis called "spastic paralysis," thus introducing an entirely new element in the case, the defense should be allowed to call witnesses in sur-rebuttal.

2. MUNICIPAL CORPORATIONS—*what necessary to charge a city with liability for failure to care for street.* In order to charge a city with liability for failure to care for an alleged public street both dedication and acceptance must be proved; and while no formal act of acceptance, nor record thereof, need be shown, yet the evidence must show an acceptance either by long continued general user by the public or by acts of officers authorized to represent the public.

3. SAME—*what proper for consideration of jury on question of a city's care of sidewalk.* In determining the question of the care of a city in inspecting a sidewalk and keeping it in a reasonably safe condition, the jury may consider the material of which the sidewalk was constructed and the manner of construction, with reference to decay and the probable need of repair.

4. SAME—*to show acceptance, repairs on street need not be authorized by city council.* If the evidence of repairs on a street, offered to show acceptance by the public, tends to show that the work was done under the direction of those who had charge of the street, it is proper for the court to deny a motion to exclude such evidence upon the ground that only the city council could accept the street.

5. DAMAGES—*rule as to liability of city for injury aggravating existing diseases.* If, prior to an injury received from a defective sidewalk, the plaintiff was afflicted with diseases which were aggravated by the fall, the liability of the city is to be measured by the damages which were the natural and proximate result of its negligence.

MAGRUDER, J., dissenting.

*City of Rock Island* v. *Starkey,* 91 Ill. App. 592, reversed.

APPEAL from the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Rock Island county; the Hon. W. H. GEST, Judge, presiding.

Searle & Marshall, and John K. Scott, for appellant:

The first requisite in establishing liability for negligence is to show the existence of a duty to the person injured. *Williams* v. *Railroad Co.* 135 Ill. 491; *Angus* v. *Lee,* 40 Ill. App. 305.

In this State an acceptance of a proffered dedication of land to public use is necessary to impose upon the authorities the burden of care of public property. *Trustees* v. *Walsh,* 57 Ill. 371; *Gentleman* v. *Soule,* 32 id. 279; *Littler* v. *Lincoln,* 106 id. 353.

Municipal acceptance is necessary to complete the dedication of a public street. *Hamilton* v. *Railway Co.* 124 Ill. 241.

The act of the public authorities should be such as to show an unequivocal intent to accept and appropriate to public use. *First Evangelical Church* v. *Walsh,* 57 Ill. 363.

Jackson & Hurst, and Rickel & Crocker, for appellee:

Intent to dedicate on the part of the owner will be presumed where it appears that the street has been used and enjoyed by the public for a period corresponding with the Statute of Limitations of real actions. 2 Dillon on Mun. Corp. (4th ed.) sec. 637; 9 Am. & Eng. Ency. of Law, 66, 69.

Acceptance by the public will be presumed when it is clearly beneficial to the public, of which actual use will be strong evidence. *Guthrie* v. *New Haven,* 31 Conn. 308; *Lake View* v. *LeBahn,* 120 Ill. 92; *Abbott* v. *Cottage City,* 143 Mass. 521.

There must be an acceptance, express or implied. Use alone, if continued for the statutory period, is evidence of acceptance. *State* v. *New Boston,* 11 N. H. 413.

Acceptance may be express and appear of record, or it may be implied from repairs made and ordered and knowingly paid for by the authority which has the legal

power to adopt the street or highway, or from long user by the public.    2 Dillon on Mun. Corp. (4th ed.) sec. 642.

There can be no good reason why one rule should be followed in establishing a dedication as against the owner and a different rule as against a municipality.    9 Am. & Eng. Ency. of Law, (2d ed.) 72.

No specific length of possession is necessary to constitute a valid dedication.    All that is required is the assent of the owner of the soil to the public use, and the actual enjoyment by the public of the use for such length of time that the public accommodation and private rights would be materially affected by a denial or interruption of the enjoyment.    *Chicago* v. *Wright,* 69 Ill. 328.

Acceptance may be shown by user by the public, as by travel, or acts of public officers in repairing and keeping up the street.    *Lake View* v. *LeBahn,* 120 Ill. 102; *Rees* v. *Chicago,* 38 id. 322.

The liability of a city caused by a defective sidewalk is not affected by the fact that the walk was not constructed by the city.    *McVeer* v. *Watertown,* 36 N. Y. Sup. 870; *Hill* v. *Sedalia,* 2 Mo. App. 1019; *Mt. Carmel* v. *Blackburn,* 53 Ill. App. 658; *Flora* v. *Naney,* 136 Ill. 45; *Hutchings* v. *Inhabitants of Sullivan,* 37 Atl. Rep. 883.

Where a party has an organic tendency to disease, and by reason of injury the disease is developed, this does not affect the measure of a party's liability for causing the injury.    *Allison* v. *Railroad Co.* 43 Iowa, 281; *Railroad Co.* v. *Kemp,* 61 Md. 74; *Stewart* v. *Ripon,* 33 Wis. 364; 5 Am. & Eng. Ency. of Law, (1st ed.) 43; *Railway Co.* v. *Riley,* 39 Ind. 564.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

The Appellate Court affirmed a judgment recovered by appellee in the circuit court of Rock Island county, against appellant, for damages on account of an injury alleged to have been received by falling on a defective

sidewalk. The declaration charged that the defendant wrongfully and negligently suffered said sidewalk to be and remain in bad and unsafe repair and condition, and divers of the stringers and planks wherewith the said sidewalk was laid to be and remain rotten, broken and unfastened. It was denied that the sidewalk was out of repair, but the principal defenses presented under the plea of the general issue were, that the sidewalk was not located on a public street of the defendant; that the alleged permanent injuries and bodily infirmities of the plaintiff had no existence, and that such disorders and infirmities as she had did not result from her fall, but existed previously and were of long standing.

It is assigned as error that the circuit court refused to grant defendant's motion for a continuance or postponement of the trial. But the abstract does not show the grounds of the motion or the affidavits in support of it. The bill of exceptions as abstracted contains only the following: "Motion and affidavits by defendant for continuance. Motion for continuance overruled. Motion for a postponement. Motion overruled by the court and jury selected and sworn." Presumably, the ruling of the court was right, and there is nothing to show that it was wrong.

The sidewalk in question was on the west side of the alleged street, which extended south from Fifth avenue up a hill. The evidence for the plaintiff was, that she was walking, in company with her husband, from Fifth avenue along this sidewalk; that her husband was walking on her right, and when about half way up the hill, owing to one of the boards being loose and his stepping on the end, it tipped and caught one of her feet, so that she was thrown forward upon the sidewalk; that immediately afterward she suffered greatly from her injury, and had convulsions, vomiting, sinking spells, excruciating pains and other difficulties for some time, and that she suffered permanent injuries by her spine becoming

curved forward in the small of her back, so as to make a hollow place much more pronounced than natural, and her right leg becoming paralyzed. As to the injuries and the resulting consequences, her attending physician, Dr. Charles C. Carter, was her principal witness. He attended her from the next day after the accident, July 6, 1896, and he testified that he found a little swelling across the top of her foot, partly discolored, which was the only external evidence of her injury. He also testified to her having convulsions, vomiting, setting her teeth, choking sensations, loss of voice, symptoms of spinal meningitis and other ailments. His testimony and all the evidence on both sides was, that she was an hysterical subject, and he said that her symptoms were characteristic of hysteria. It was proved that long before this accident she had substantially the same symptoms and physical troubles, with the exception of the alleged difficulty with the spine and paralysis of the right leg. These were the main injuries which the evidence in her behalf tended to show resulted from the fall, and they were the main injuries for which she sought to recover. In the opinion of Dr. Carter there was an anterior curvature of the spine, making a hollow in her back, and her right leg was completely paralyzed; and there were other witnesses, both lay and medical, who testified to the same conditions. As against these alleged permanent injuries, the defense made at the trial was, that there was no deformity or abnormal curvature of the plaintiff's spine; that her right leg was not paralyzed; that she was an impostor and a fraud, and that her alleged injuries of that kind were feigned. There was a sharp contest over this question, and the evidence was in irreconcilable conflict. The condition of plaintiff's back was presented as accounting for the paralysis of her leg, and it was claimed that she had not used the leg since the accident. The evidence on both sides was that the right leg was slightly larger, by measurement, than the left; that the color was good and

the muscles firm and as well developed as those of a sound leg, and that there was no atrophy or wasting. It was insisted on one side that if there had been paralysis and entire disuse there would be atrophy and shrinking, and on the other hand, that there might not be.

In January, 1899, two years and a half after the accident and a few months before the trial, an examination of the plaintiff was made by three physicians, at which Dr. Carter was present. These three physicians testified that there was no deformity of the plaintiff's spine; that there was a curve just above the hips, which was entirely natural; that plaintiff was a large and fleshy woman, and that thick layers of flesh and fat just below the alleged curvature created the appearance of a depression. They said they made a very careful examination and used all the known tests and found there was no difficulty with the spine. Their evidence tended to prove plaintiff feigned the existence of painful areas in her body and would cry out on pressure, but if her attention was attracted elsewhere she would not notice pressure at all. They also testified that the muscles of the leg were active and perfect; that they had her get out of bed and saw her move the leg in doing so; that while she was sitting in a chair one of them lifted the leg off of the floor and extended it in a horizontal position and then removed the support, and that she held the leg in that position a short time and then let it down slowly to the floor. They said this test demonstrated that she had muscular action; that if the limb was paralyzed the muscles would be paralyzed, and that it required muscular power to hold it up and let it down as she did. Their conclusion was that there was no paralysis whatever. One of these physicians did not leave the house with the other two but remained with Dr. Carter, the attending physician. He testified that he then said to plaintiff, "Mrs. Starkey, if that leg is paralyzed why in the world didn't it drop?" That she said she had rheumatism in

the knee joint; that he then let the leg go, and the instant he did so it fell to the floor. There was also evidence of Dr. Carter and others of her own witnesses that she had previously attempted to deceive them in respect to other physical manifestations, and the medical testimony was that such attempts at deceit were characteristic of hysteria.

After the defense closed their evidence, the plaintiff called Dr. Carter in rebuttal. He then testified that there was a species of paralysis in which a leg might be extended a moment before it would fall, and then fall irregularly, in little jerks. This, he said, was spastic paralysis, which being interpreted means paralysis of a spasmodic character, where there is contraction and rigidity. He said that in that sort of paralysis the leg might become fixed like a lead pipe. When he was on the stand before, he had testified to a condition of ordinary paralysis, and in speaking of his tests said, "I raised the leg and it always dropped." When re-called he said he was surprised to see the leg acting the way it did at the examination, but he also said he noticed the spastic condition first in December,—a month before the examination, after he had been attending plaintiff about two and a half years. He said that after the other physicians had gone, when the remaining one asked plaintiff why she did not drop the leg if she had paralysis, and he extended the leg and let go of it, it did drop quicker than when they were all examining it, but that it still retained some of the spastic condition. After this testimony defendant sought to re-call two of the physicians who were present at the test, but the court refused to allow them to testify. We think fairness required that the defense should have been allowed to meet this proposition. All the testimony for the plaintiff up to that time had been that the leg was limp and useless, and there was no hint of any rigid or spastic form of paralysis. It had not been so much as suggested that plaintiff

had an exceptional sort of paralysis, but it was entirely new matter and a new theory. The question how the leg would act if suffering from spastic paralysis had not been raised. The existence of this particular variety of paralysis was not entirely consistent with the previous evidence for the plaintiff, and when the new theory was presented defendant ought to have been allowed to show that the symptoms were not of that kind. The argument in support of the ruling is, that it would be simply going over what the physicians had already testified to. They had testified that they saw plaintiff move the leg in getting out of bed and that the leg did not immediately fall when the support was removed, and that she could not have had paralysis and held it as she did. Of course, it would not be proper to allow the witnesses to be re-examined to prove the same facts, but Dr. Carter testified that the leg would remain extended for a time and go down by little jerks. To re-examine the doctors to show whether it went down a notch at a time, by little jerks, or whether it manifested rigidity or tonic spasm or the symptoms of spastic paralysis, would not be going over the same ground.

One of the defenses was that the place where the alleged accident occurred was not a public street as to which the defendant was charged with any duty or responsibility, and it is assigned for error that the trial court gave the second instruction asked by plaintiff, telling the jury that the acceptance of the street by the city might be shown by long continued use by the public. The evidence in respect to the street was, that it was never laid out as a public highway and there was never any formal act of dedication or acceptance. About thirty-nine years before the accident the strip of the width of an ordinary street was opened to public use by the owner of the adjoining land, and it was commonly called "Andrews street," from his name. It extended south from Fifth avenue up the hill about seven hundred feet, where

it stopped, and the only outlet from that end was by an alley on each side. There were houses on each side, and the sidewalk in question was built by Porter Skinner, who lived on the west side and had several tenement houses fronting on the street. The evidence for the plaintiff tended to show that the strip had been used as a way for public travel for more than twenty years; that the officers in charge of the streets of defendant, and persons working under them, had repaired the street and filled up holes with clay and macadam and graded it so that teams could pass; that the grade was given by the city engineer and city teams did the hauling; that a gutter was built by the city and water mains were put down in the middle of the street under its direction, and that in the revised ordinance it was ordained that this street, which had been called Andrews street, should be called Thirty-first street. It was not denied that the street was used by all who saw fit or had occasion to use it, but the defendant denied the work on the street was done by direction of the city authorities or that the city built the gutter. The defendant claimed that it had not accepted the street through its proper authorities, and that the council did not intend to accept the street by giving it a name. The instruction complained of states, in substance, as rules of law, that to constitute a street it must appear, from the evidence, that the street in controversy is a public way used by the public for street purposes and accepted by the city authorities for public use; that the acceptance may be shown by proof of long continued use of the alleged street as a public way; also by evidence that the city authorities have, by its workmen or laborers, made repairs in its corporate capacity on the alleged street for the purpose of improving it as a street, and that the jury may consider any evidence that the city has, by ordinance, designated it as a public street.

In order to charge a city with liability for a failure to care for an alleged public street, as in this case, both

the dedication and an acceptance must be proved. No formal act of acceptance is necessary nor any record of such an act, but the evidence must show an acceptance of the street by those authorized to represent the public. Where there is no formal acceptance by the municipality and there is an attempt to prove an adoption of the street by the public authorities, the question is one of fact, and in the cases cited by the respective parties it was dealt with as such a question. In some cases the evidence has only shown that a few parties occasionally traveled over the road, and in considering the question what would justify an inference of the fact of acceptance it has been said that mere travel by the public does not, of itself, constitute an acceptance. (*Forbes* v. *Balenseifer*, 74 Ill. 183.) Such user as amounts to an acceptance may be shown by travel and by acts of public officers in repairing and keeping up the highway. (*Woodburn* v. *Town of Sterling*, 184 Ill. 208.) Again, it has been said that an acceptance may be shown by user by the public, as by travel, or by the acts of the public officers in repairing and keeping up the streets. (*Town of Lake View* v. *LeBahn*, 120 Ill. 92.) In another case, where a way had been for a long time in constant and general use by the public, it was said that an acceptance might be evidenced by user. (*City of Sullivan* v. *Tichenor*, 179 Ill. 97.) Treating the question as one of fact, from the circumstances of the particular case, it has been held that long continued and general public use or the acts of public officers may be sufficient to prove the fact. It is the law that it must appear the street was accepted by the city authorities for public use, and the instruction was proper in that statement. It was not accurate in saying, as a matter of law, that the acceptance would be proved by evidence of long continued use as a public way. The instruction declared the rule that long continued use, regardless of its manner or extent, would establish the acceptance, and it does not require that it should be general. There might

be long continued use as a public way by a few persons, and the use not be of such general character as to necessarily show an intention of the public authorities to accept the street. Use by the public is evidence tending to show an acceptance, (*Woodburn* v. *Town of Sterling, supra,*) and that is the most that the court could say as a matter of law. In this case there was much other evidence of acceptance besides the use made of the street, and perhaps the inaccuracy of the instruction would not alone be ground for reversing the judgment.

The third instruction given at the request of plaintiff told the jury that if they believed, from the evidence, that the street in controversy was a public street in the city of Rock Island, the defendant was bound to exercise ordinary care to keep it in repair. This instruction is objected to by counsel on the ground that it did not tell the jury what was necessary, in law, to constitute a public street. It was not necessary to repeat in every instruction which referred to the street, the facts which would create a street.

It is complained of the ninth instruction given at the request of plaintiff that it gave the jury leave to consider the manner of construction of the sidewalk in determining the question of care or negligence of the defendant. The sidewalk was not built by the defendant, and there was no charge in the declaration that the original construction was faulty in any respect. We do not think the instruction allowed the jury to consider any faulty construction or to charge the defendant on account of it. It had been built a number of years, and the only point of the instruction was, that in considering the obligation of the city to use reasonable care the jury might consider what kind of a sidewalk it was, and that would not be objectionable. (*City of Joliet* v. *Johnson,* 177 Ill. 178.) In determining the question of the care of the city in inspecting the sidewalk and keeping it in reasonably safe condition, the jury might properly consider the material

of which it was constructed and the manner of construction with reference to decay and probable need of repair.

It is complained that the court refused the thirty-third instruction offered by defendant on the proposition that plaintiff was bound to act in a reasonably prudent manner in caring for her injuries, and that if they believed she did not disclose her previous condition to the doctor, so that he did not properly diagnose and treat her injuries, she could not recover from the defendant for permanent injuries. There is no evidence in the record that her failure to tell the doctor that she had had hysterical attacks before, in any way affected his treatment. He testified that she was an hysterical subject, and he was not ignorant of her peculiarities.

It is also assigned as error that the court refused to exclude from the jury evidence of repairs on the street, and refused an instruction on the same proposition. This is on the ground that only the city council could accept the street. The evidence tended to show that the work and repairs were done by or under the direction of those who had charge of the streets, and the ruling was correct.

The court refused to give a number of instructions asked by the defendant, to the effect that if the plaintiff's condition was the result of hysteria or physical infirmities that existed prior to the accident she could not recover damages for it and she could not recover for a pre-existing condition. This is complained of, and, on the other hand, it is insisted that the propositions contained in these instructions, so far as good, were embraced in other instructions. Instructions were given which stated, generally, what plaintiff was required to prove, and that she must show that she received the injury and that it was the proximate result of the city's negligence in permitting the sidewalk to be out of repair. The court also gave an instruction that if the jury believed she was not injured by her fall, and that her disabilities were not real but feigned, to recover money

fraudulently from the defendant, they should find for the defendant. There was no instruction, however, which in any way separated or brought to the attention of the jury the rule as to the liability of the city for aggravation of previous conditions which were acknowledged to exist. If, prior to the injury, plaintiff had diseases which were aggravated by the fall she might recover from the defendant, but its liability would be measured by the damages which were the natural and proximate result of its negligence. The evidence tended to show something more than a mere latent tendency to particular diseases, and if there was an aggravation of the existing diseases the city would only be liable for what resulted from the fall. We do not think the substance of these instructions was covered by others.

The judgments of the Appellate Court and circuit court are reversed and the cause is remanded to the circuit court.                    *Reversed and remanded.*

Mr. JUSTICE MAGRUDER, dissenting:

In my opinion there is no good reason for reversing the judgments of the lower courts in this case. The Appellate Court properly disposed of all the issues and questions involved in the following opinion:

"Mrs. Belle Starkey brought this action against the city of Rock Island to recover damages for injuries which she claimed to have sustained from a fall on a defective sidewalk on the west side of Thirty-first street, in said city. Upon a second trial she recovered a verdict awarding her damages, and a judgment for said damages, and the city of Rock Island prosecutes this appeal therefrom.

"*First*—Appellant claims that the place where this injury occurred had not been accepted as a public street by the city of Rock Island, and it therefore is not responsible for any injuries appellee may have received on that spot. The strip of ground in question was of the ordinary width of a street, and it extended south from Fifth

avenue seven hundred feet, to a dead end. It had, how-
ever, an alley on each side, through which access could
be had to other streets. The fact it ceased at a dead end
is not inconsistent with its being a public street. (*Sheaff*
v. *People*, 87 Ill. 189). There were two dwelling houses on
the east side of the street, and eight or ten, or more, on
the west side. Some thirty-nine years before this acci-
dent this strip of ground was opened to public use by the
owner of the adjoining lands, one Andrews, and it was
for many years called 'Andrews street.' A subsequent
owner of the adjoining land built the sidewalk on the
west side of the strip. No formal action by the city
council was proven by which it accepted the offer to dedi-
cate this strip for a street, plainly implied by turning it
out to public use, as the owner did. The proof, however,
shows that the public used the strip as a way for public
travel for about thirty-nine years; that from 1880 down
to the time of this injury the street commissioner made
repairs upon the street several times, filling up the places
which had been washed out, and grading it, and obtain-
ing the grade from the city engineer. A gutter was built
in the street. There was proof (though disputed) that
it was built by the city, under the direction of the street
commissioner. Water mains were put down in the middle
of the street, under the direction of the water committee
of the city. The city dug the ditch and laid the main and
paid for the labor and water pipes, and the city's super-
intendent of water-works had charge of digging the ditch
and laying the main. The revised ordinances of the city
contained a chapter entitled 'Street Names,' a part of
the first section of which was as follows: 'The names of
the streets of said city hereinafter mentioned, running
north and south, be and are hereby changed, and in lieu
of their present names said streets shall be and hereby
are designated and named as follows, to-wit:  *  *  *
*Twenty-ninth street*—The street now known as Twenty-
ninth street, and Columbia street, in Howard's addition,

shall be called Twenty-ninth street. *Thirtieth street*—Elm street shall be called Thirtieth street. *Thirty-first street*—Andrews street and Thirty-first street, in South Park, shall be called Thirty-first street.' This chapter contained various provisions for numbering the houses fronting on any street in the city, and for placing at street corners signs designating the names of the streets. All the general language of the chapter applied as fully to this strip of land formerly called Andrews street as to any other street of the city. It was held in *Town of Lake View* v. *LeBahn*, 120 Ill. 92, that an acceptance of a street may be shown by user by the public, as by travel, or by acts of public officers in repairing and keeping up the streets. In *City of Sullivan* v. *Tichenor*, 179 Ill. 97, it was held that an acceptance of a street as dedicated to the public might be evidenced by user; that no formal act or ceremony was necessary to an acceptance, and that it was not necessary that there should be any record of such an act by which the public was invested with the easement.

"We are of opinion it sufficiently appeared from the evidence in this case that the public had accepted this strip of ground as a public street, and that the city of Rock Island was responsible for the sidewalks thereon. It was said in *Village of Marseilles* v. *Howland*, 124 Ill. 547, that an incorporated town was not bound to build a sidewalk upon a public street, but that if one was constructed by an individual and used by the public with the knowledge of the town authorities, the law would require the town authorities to remove the walk or assume responsibility for its reasonably safe condition.

"*Second*—Appellant argues that the sidewalk where appellee received her injury was not out of repair at that time. There was much proof offered each way upon that question, and it was a proper one for the determination of the jury. The jury have found that it was out of repair, and we see no reasonable ground for disturbing that conclusion.

189—34

"*Third*—Appellant claims it had no notice of the defective condition of the sidewalk. There was proof tending to show that the sidewalk had been out of repair so long that the city should have ascertained the fact, and also proof that the sidewalk was so constructed and had been down for such a long time that the city should have known that it required inspection, and should have inspected it and ascertained its defective condition.

"*Fourth*—Appellant argues that the condition of appellee complained of was not the result of this fall upon the sidewalk. The testimony of all the witnesses who treated or saw appellee at that time supports the verdict of the jury upon that point. Appellee had been subject to serious physical ailments years before this fall, and even if these ailments still existed at the time of her fall, they were much aggravated by the fall, and notwithstanding her impaired physical condition she could recover for such injuries as resulted from the fall.

"*Fifth*—Appellant argues that appellee is feigning paralysis of her left leg. Such is the testimony of several experts who saw her but once, and who attended at the instance of appellant. These experts were contradicted by many witnesses who saw her often or several times, and by the physicians who treated her at different times since her fall. While the testimony of these experts unquestionably raises a doubt as to the seriousness of appellee's injuries, yet we are unable to say that the jury erred in finding as they did on this subject, when all the evidence is considered, or that another jury would reach a different conclusion from the same evidence.

"*Sixth*—Complaint is made of many rulings of the court upon the evidence. Most of these relate to the admission of proof of user of Thirty-first street by the public, and of acts of public officers in making repairs and improvements therein, when there had been no proof of any ordinance expressly accepting the strip as a public street. For the reason already stated, we hold these

rulings were correct. One of the plaintiff's witnesses having testified to the laying of a water pipe in Thirty-first street, defendant sought to show, on cross-examination, that it was not uncommon for the witness, when superintendent of the city water-works, to lay such pipes for the city on private property. The court properly sustained an objection to this line of cross-examination. It was not germane to the direct examination. If the city had laid pipes at other places across private property, and if that fact had any tendency to rebut plaintiff's case, such matter was independent proof for the defendant, to be offered by it when it came to make its case. Defendant's experts testified that when they made an examination of the plaintiff they straightened her leg and placed it in a horizontal position and then removed the support from beneath it, and that plaintiff held her leg there for a little while and then let it down gradually to the floor, and that this demonstrated it was not paralyzed. In rebuttal, plaintiff recalled Dr. Carter, who testified that there is a condition of paralysis in which the leg may momentarily be extended before it falls, and may fall irregularly,—that is, gradually, by little jerks. After he had been cross-examined at length, and the plaintiff's rebuttal was closed, defendant's counsel asked leave to recall Drs. Eyster and Hollowbush to contradict Dr. Carter. The court refused, and defendant excepted. Drs. Eyster and Hollowbush had been fully examined by defendant upon that subject. Dr. Eyster had testified that plaintiff's ability to hold the limb extended and lower it gradually to the floor showed muscular control of the functions of the limb; that if the limb was paralyzed the muscles were powerless, and the force of gravity would cause the leg to fall when the support was removed, and that when there was nothing under the leg, and it was kept extended and gradually let down in that way, this was absolute proof that there was no paralysis, and that a paralyzed limb cannot be moved. Dr. Hollow-

bush had testified to the fact of plaintiff's leg remaining extended for a perceptible length of time after the support was removed, and that this showed she had control of the muscles of the leg, or otherwise she never could have held it out in that way or lower it as she did, and that he knew of no form of paralysis that would enable a woman to hold her leg extended without any support and gradually let it fall to the floor. Dr. Carter's testimony was but rebuttal to what these other physicians had already stated. If the court had permitted defendant to recall these physicians upon this subject it could only have been to again repeat their declaration that the conduct of the plaintiff in retaining her leg for a moment in a horizontal position after the support was removed and then letting it down again gradually to the floor was absolute proof that she was not paralyzed, and that there was no form of paralysis where that could be done by the patient. The court did not err in refusing to permit defendant to have this evidence repeated to the jury.

"*Seventh*—Appellant offered many instructions. Those refused, so far as proper, were embodied in those given. The court was not bound to repeat the same proposition many times. The jury were fully and properly instructed.

"*Eighth*—The judgment here complained of was rendered upon a second trial, there having been a first trial of the cause some months before. Just prior to the commencement of the second trial appellant moved for a continuance, and that motion was heard upon affidavits filed by it, and was denied, and appellant then moved for a postponement of the trial, which was also heard upon affidavits presented, and denied. Bills of exception were then taken preserving the affidavits filed upon said motions, and the rulings of the court thereon and exceptions to said rulings. Two reasons were urged both for a continuance and a postponement. The first was, that there had recently been a municipal election in the city of Rock

Island and a new mayor and city attorney had been elected, and that the city attorney was not prepared to try the cause. It was not shown but that plenty of time had passed after the election and before the trial to have enabled the newly elected city attorney to prepare to try the cause.   After the installation of the city attorney several days elapsed before the trial actually began. It was a second trial and the city must have been fully informed of the proof to be presented.   The affidavits showed C. B. Marshall was the former city attorney, and in his affidavit filed in support of the motion to postpone, he stated that he was then one of the attorneys in the case, and the record shows he participated in the subsequent trial, so that the city had the benefit of his prior knowledge of the case as fully as if he had remained city attorney.   It is apparent from the record that the city was fully and ably defended, and we are unable to say that any injustice was done to it by the refusal to continue or postpone the trial.   There were many witnesses, and appellee had necessarily been to great expense to procure the attendance of her witnesses, and she ought not to have been lightly or for trifling reasons deprived of a trial.   The city had a continuous existence, notwithstanding the change of control.   It was bound to prepare for the second trial.   The prior administration had ample time to make such preparations, and there is no showing that it did not do so.   The other ground upon which continuance and postponement were sought was the absence of certain witnesses.   It was not shown that they had ever been subpœnaed, or any effort made to take their depositions or to procure their attendance, except the act of sending some telegrams just before the motions for continuance and postponement were made.   It also appears that the testimony of the absent witnesses would have been merely cumulative.   We are unable to say the court erred in denying the motions.

"The judgment is therefore affirmed."