SARAH E. ROSE, Defendant in Error, *vs.* THE VILLAGE OF ELIZABETHTOWN *et al.* Plaintiffs in Error.

*Opinion filed October· 24, 1916.*

1. INJUNCTION—*injunction is the proper remedy when a city takes possession of a street to which it has no right.* Where a municipality undertakes to take possession of a street to which it has no right the proper remedy is a bill for injunction.

2. HIGHWAYS—*what is necessary to constitute a common law dedication to the public.* Where there is no evidence showing that a plat is statutory the rules governing a common law dedication must be followed, and in order to constitute such a dedication the proof must be clear and convincing that the owner intended to donate the land to the public use for a street and that the public have accepted it for that purpose.

3. SAME—*making of a common law plat only evidences intent to dedicate.* The making of a common law plat and the sale of

lots with reference thereto are only evidence of an intent to dedicate, which, like every other dedication, to be made complete and carried into effect so as to create public rights, must be accepted and acted upon by the public.

4. SAME—*acceptance of common law dedication may be express or implied.* The acceptance of a common law dedication may be an express one, evidenced by some formal act by the public authorities, or it may be implied by their acts, such as repairing, lighting or assuming control of the land dedicated, or by user by the public for the purposes for which it was dedicated, and when the dedication is very beneficial or greatly convenient or necessary to the public an acceptance will be implied from slight circumstances.

5. SAME—*mere travel does not, alone, constitute acceptance of common law dedication.* Mere travel by the public does not, of itself, constitute an acceptance of a common law dedication, but, taken in connection with other facts and circumstances, it may be regarded as tending to show acceptance when it is adverse, as a matter of right, and not merely permissive.

6. SAME—*common law plat has no effect as a conveyance and the offer to dedicate may be revoked before acceptance.* A common law plat has no effect as a conveyance, and an offer to dedicate thereby created may be revoked by the owner or his grantee at any time before acceptance by the public.

7. SAME—*common law dedication once accepted is irrevocable.* After a common law dedication is once accepted by the public it is irrevocable except with the consent of the public and of those persons who have vested rights in such dedication.

8. SAME—*a common law dedication must be accepted within a reasonable time.* The acceptance of a common law dedication need not immediately follow the offer to dedicate but must be within a reasonable time and before withdrawal by the offerer.

9. SAME—*what may show revocation of an offer to dedicate by common law dedication.* What constitutes a revocation of an offer to dedicate depends very largely upon the circumstances and is usually a question of fact, and it may be shown by acts inconsistent with the public use to which the land is offered to be dedicated, as by conveyance of the property, or by enclosing the land so as to exclude the public use, or by erecting buildings on the land offered to be dedicated as a street.

10. SAME—*what shows an intention to revoke offer to dedicate.* Where the owner or his grantee builds a pavilion or summer house

on property offered to be dedicated as a street, and where it is clear from all the testimony that the land was used by the owner and his grantees as if it were private property in which the public had no right, it will be presumed that the owner and his grantees intended to revoke a common law dedication of a strip of land to the public for a street.

11. SAME—*when offer to dedicate is revoked.* Where land offered to be dedicated for a street by a common law dedication is not accepted by the public before the death of the dedicator, who has sold the land, the offer to dedicate will be revoked unless the grantee of the dedicator has affirmatively indicated an intention to continue the offer of dedication.

12. SAME—*acts showing acceptance by public have no effect after revocation of common law dedication.* Ordinances passed by a village naming a certain street which was offered to be dedicated by common law dedication can have no effect as an acceptance when passed after the withdrawal of the offer to dedicate.

13. SAME—*the acceptance of part of the streets on a common law plat does not necessarily constitute acceptance of other streets.* An acceptance of a part of the streets on a common law plat does not necessarily constitute an acceptance of other streets in the same plat.

14. SAME—*what facts do not show dedication to be so necessary as to imply an acceptance from slight circumstances.* Where the proof shows that for more than twenty years the present owner of land dedicated as a street on a common law plat has claimed exclusive authority over and use of the strip and has used it practically all that time to the exclusion of the public, and that trees and rocks are located on the strip in such a manner as to prevent any well defined line of travel as a public highway, it cannot be maintained that the dedication to the public was so necessary or convenient that an acceptance of the common law dedication should be implied from slight circumstances.

WRIT OF ERROR to the Circuit Court of Hardin county; the Hon. JULIUS C. KERN, Judge, presiding.

R. F. TAYLOR, JAMES E. DENTON, and JAMES C. COURTNEY, for plaintiffs in error.

JAMES A. WATSON, and JOHN W. BROWNING, for defendant in error.

Mr. JUSTICE CARTER delivered the opinion of the court:

This was a bill filed by defendant in error, Sarah E. Rose, in the circuit court of Hardin county, to restrain the village of Elizabethtown, its officers and agents, from interfering with a tract of land which she claims is her private property but which said village authorities claim as a public street. The court granted an injunction as asked for in the bill. The cause has been brought here by writ of error.

The land now constituting this village was originally owned by James McFarlan. In 1841 he laid out what is now called the "old plat," which includes most of the western part of said village, and in 1850 he laid out what is now called the "new plat," which includes the eastern part of said village. The following is a copy of the two plats as found in the record, united for convenience:

James McFarlan, from the time the eastern part of the village was platted until his death, in 1882, with the pos-

sible exception of two or three years in the early sixties, resided on lot 4 in said new plat. In 1877 he deeded said lot 4 to his brother, B. P. McFarlan, who deeded it in 1879 to Matilda McFarlan, the wife of said James. The year after her husband's death she deeded the lot, with the exception of a strip off the north side thereof, which is not included in this litigation, to her daughter, Elizabeth Poor, reserving a life interest in herself. In March, 1890, Mrs. Poor and her husband deeded that portion of the lot she owned to William P. Warford, and he conveyed it in August of the same year to James B. and Laura McFarlan. By said last named grantees it was conveyed to Jane A. Crozier, and November 19, 1891, she conveyed it to defendant in error, Sarah E. Rose. The deeds, starting with that to Warford, described the land as lot 4 in the new plat of the village of Elizabethtown, "extending from First street to the water's edge of the Ohio river." On said lot 4 is situated a hotel, which has been conducted as such by defendant in error since she purchased the lot, and for some years before it was apparently rented by her for the same purpose. Said lot is bounded on the west by Main street and on the east by an alley. Between the southerly line of said lot 4, as shown by the plat, and the water's edge of the Ohio river, is a strip of land which at the broadest portion on the west side is about 132 feet in width and narrows rapidly toward the eastern portion of the lot. We judge from the evidence that this strip is a bluff of rock, and for most of the entire distance along the front of lot 4 is a steep or abrupt bluff. Just how high it is is not clear from the evidence. In low water from the top of this bluff to the water's edge is ordinarily about 32 feet, the beach proper from the foot of the bluff to the water being included in this distance. In high water the river sometimes comes to the top of the bluff and in very high water runs over it. On the west side of this lot is a gulch or ravine coming within a few feet of the corner of the lot,

and there is another gulch or ravine on the east side, about at the opening of the alley there located. The land is apparently lower at the edge of the bluff than where the house is located, and we infer from the evidence that it slopes gradually downward from the house, both towards the bluff and towards the gulches on either side. There is evidence tending to show that the original owner had fences extending along each side of lot 4 to the water's edge, but that they were washed away by high water in the early sixties. Since that time the evidence shows these fences have only extended to the south end of the lot as originally platted, and for a long time, until within three or four years ago, a picket fence stood in front of said lot, about on the south line as platted. There is testimony to the effect that the original owner used this property in front of the picket fence for piling ties and for several years as a wood yard. At that time this space was often designated as "McFarlan's front yard." In 1882, shortly before his death, he built a summer house or pavilion on the bluff fronting on the Ohio river, and since that date this tract of ground here in dispute, from where the picket fence was located to the bluff, including this pavilion, has been used by the owners (including defendant in error) and the guests of the hotel as a lawn or park in connection with the hotel. Defendant in error, when she first purchased the place, set out from fifteen to twenty trees, which are still growing on this land, and has had laborers cut the grass and care for the property, including the repair of the pavilion, until the dispute between her and the village authorities, beginning in 1913. She leased this property also for two years, between 1891 and 1893, for piling ties. The following plat, which is approximately correct, will assist in understanding the character of the property in dispute and its surroundings:

Counsel for plaintiffs in error contend that this property was dedicated by the original owner, when he platted it, as a street from the south line of lot 4 as platted, to the water's edge, and it is also claimed that all the other property similarly shown on the plats along the river bank, both in the old and the new plats, was dedicated for the same purpose, and that the public authorities have accepted this dedication. For many years—doubtless from the time the village was first platted—there has been a wharfboat on the river's edge, to be used by the steamers on the Ohio river for landing and for taking on and putting off passengers and freight. That wharfboat is now located from 150 to 200 feet west of Main street. Many years ago, at various times, the wharfboat was located at the southern end

of Dunn street, some of the testimony tending to show that it was only located at Dunn street at times of high water. The testimony is to the effect that when it was located at that point the passengers often traveled to and from the wharfboat across this portion of the bluff over the strip of property here in dispute. There is evidence also that tends to show that wagons and drays drove over it at such times, and that at various other times before defendant in error took possession of this property, wagons and buggies had driven over it. There is also evidence to the effect that the original owner (McFarlan) had refused permission to the general public to drive over it with teams and wagons, but told one of the witnesses that, considering who he was, he would allow him to drive over it for a specific purpose. When Mrs. Rose purchased this property the former owner definitely told her that she owned and was deeding the land to the water's edge. Beyond question, since she purchased this property she has always claimed to own to the water's edge. While there is testimony to the effect that since that time people have driven over it with drays, wagons or buggies, there is also a great amount of testimony by many witnesses that Mrs. Rose and her daughter had repeatedly refused permission to people to drive over the strip on the bluff in dispute and had attempted in every way to exercise jurisdiction over it except to enclose it, and that some ten or twelve years before this litigation was instituted she extended the boundary fence on the eastern portion of the lot by wire to the bluff. The then president of the village board ordered the wire taken down, but it is manifest that Mrs. Rose still claimed the entire authority over it, for shortly thereafter she built a wall of rock a few feet west of the eastern side of the disputed strip, which made it practically impossible for any team to drive across the bluff. There is testimony, too, that this portion of the lot was so steep, containing several ledges which dropped rapidly toward the gully on the east, that it was almost im-

possible to draw a heavy load up or down that portion of the disputed strip. Mrs. Rose, as already stated, had kept in repair the summer house or pavilion on the top of the bluff. In 1913 she attempted to repair this again and the city authorities interfered. Out of that dispute grew litigation which is still pending. In 1914 the village authorities attempted to tear down the wall of rock across the eastern portion of this disputed strip, and as a consequence of what then took place several persons were arrested. This proceeding was immediately thereafter instituted.

Counsel for plaintiffs in error argue that injunction is not the proper remedy. Where a municipality undertakes to take possession of a street to which it has no right the proper remedy is a bill for injunction. *City of Peoria* v. *Johnston,* 56 Ill. 45; *McIntyre* v. *Storey,* 80 id. 127; *Lowery* v. *City of Pekin,* 186 id. 387; *Waller* v. *Village of River Forest,* 259 id. 223.

Did the original owner, when he made the new plat, including the property here in question, intend to dedicate this strip, and that east of it, as a street for public use? Counsel for plaintiffs in error insist that under the reasoning of this court in *Godfrey* v. *City of Alton,* 12 Ill. 29, *Village of Brooklyn* v. *Smith,* 104 id. 429, *Owen* v. *Village of Brookport,* 208 id. 35, and other like cases, the original owner, when he platted this property on the bank of a navigable river, must be held to have intended to dedicate the vacant space between the front of the lots and the river for public use. Counsel for defendant in error contend that this vacant property in front of the lots as platted was not marked by the word "street" or any other words to indicate it was intended to dedicate it to the public, and therefore, under the decisions of this court in *City of Chicago* v. *Drexel,* 141 Ill. 89, *Mason* v. *City of Chicago,* 163 id. 351, *Birge* v. *City of Centralia,* 218 id. 503, and *Poole* v. *City of Lake Forest,* 238 id. 305, it cannot be said, from the plat alone, that the original owner intended to dedicate

this to public use.  It may be urged in support of plaintiffs in error's contention that unless this space between the river and the blocks in the new plat was intended as a public way it would be impossible to have access to lot 12, and that certain other lots in the plat could otherwise only be reached by means of a narrow alley, while, on the other hand, it is urged that the configuration of the ground is such that this strip between Pearl and Dunn streets could not be considered a street for practical use on account of the character of the bluff at that point.

The records of Hardin county were destroyed by a fire which consumed the court house and contents in 1884, including the two plats of the village of Elizabethtown.  At the time Mrs. Rose purchased this property there were no plats of record as to said village or its lots.  The village authorities in 1894 commenced proceedings in the circuit court and after taking evidence restored by a decree of that court the old and new plats, as heretofore set out.  The testimony taken at that time in no way referred to or designated by name the strip of property here in dispute or any of the strip in front of the property as platted in both the old and new plats.  There is, however, testimony of witnesses in the record that all of this property between the river's edge and the southerly ends of the lots as platted, in both the old and new plats, was known as Water street, and in 1888 the village authorities passed an ordinance stating that, commencing at the Ohio river and going north, the name of the first street should be Water street, and in another ordinance that the banks of the Ohio river, within certain easterly and westerly limits, which include the bank in front of block 4, should be public landing places for the village.  There was no evidence in the record indicating that either of these plats can be held to be statutory.  Therefore, in deciding whether this property was dedicated for a street, we must be guided by the rules that govern common law dedication.  In order to constitute

such a dedication the proof must be clear and convincing that the owner intended to donate the land to the public use for a street and that the public have accepted it for that purpose. (*Doss* v. *Bunyan*, 262 Ill. 101, and cases cited; *City of Chicago* v. *Drexel, supra.*) In the last case cited, as in this, no question was raised as to the rights of the owners of land in the platted property. No private owners are parties to the proceeding, and none of them are asking to contest the relief which the complainant is seeking by her bill to obtain as against the village. It was said in that case on this point (p. 106): "It may be admitted that owners of lots in said subdivision who have purchased by the plat are entitled to certain easements in and over the grounds laid off on said plat as ways, but their right to such easements has no tendency to establish the title of the city to said ways as public streets or highways." These rights were purely "in the nature of private rights founded upon a grant or covenant, and no public rights attached to such streets or lands until there has been an express or implied acceptance of the dedication, evidenced either by general public user or by the acts of the public authorities."

The making of a common law plat and the sale of lots with reference thereto are merely evidence of an intent to dedicate, which, like every other dedication, to be made complete and carried into effect so as to create public rights, must be accepted and acted upon by the public. (3 Dillon on Mun. Corp.—5th ed.—sec. 1090; *Littler* v. *City of Lincoln*, 106 Ill. 353; *Russell* v. *Chicago and Milwaukee Electric Railway Co.* 205 id. 155; *Mason* v. *City of Chicago, supra.*) The acceptance may be an express one, evidenced by some formal act by the public authorities, or it may be implied by their acts, such as repairing, lighting or assuming control of the lands dedicated, or may be implied by user by the public for the purposes for which it was dedicated. When the dedication is very beneficial or greatly convenient or necessary to the public, acceptance will be implied from

slight circumstances. (*Alden Coal Co.* v.: *Challis,* 200 Ill. 222; *Russell* v. *City of Lincoln,* 200 id. 511.) Mere travel by the public does not, of itself, constitute an acceptance, (*Forbes* v. *Balenseifer,* 74 Ill. 183,) but taken in connection with other acts and circumstances it may be regarded as tending to show acceptance. (*City of Rock Island* v. *Starkey,* 189 Ill. 515; *Woodburn* v. *Town of Sterling,* 184 id. 208.) This plat, as we have seen, was not a statutory one. It therefore could have no effect as a conveyance. Viewed in the most favorable light for the plaintiffs in error, it could only constitute an offer to dedicate, under which, upon acceptance by the public, an easement of passage would be acquired by the public. (*LaSalle Varnish Co.* v. *Glos,* 254 Ill. 326.) Therefore the question of acceptance by the public is a vital one in the decision of the case, as until such acceptance the owner or his grantee could revoke the offer to dedicate. (*City of Chicago* v. *Drexel,* *supra,* and cases cited; 8 R. C. L. 913; 1 Elliott on Roads and Streets,—3d ed.—sec. 165; 3 Dillon on Mun. Corp.— 5th ed.—sec. 1091.) After it is once accepted by the public a dedication is irrevocable, (*Moffett* v. *South Park Comrs.* 138 Ill. 620,) except with the consent of the public and of those persons who have vested rights in such dedication. 3 Dillon on Mun. Corp. (5th ed.) sec. 1091; see, also, *Hill* v. *Kimball,* 269 Ill. 398.

There is no satisfactory evidence that the offer to dedicate this disputed strip of property for a street, between the river bank and the south line of the land as platted, had been accepted by the public before the death of the original owner, McFarlan. No express action is shown by the village authorities before that date which has any bearing on such acceptance. Mere travel, as we have seen, is not sufficient to show acceptance by the public, and such travel, in order to have any weight on the question of acceptance, must have been adverse, as a matter of right, and not merely permissive. (*Palmer* v. *City of Chicago,* 248 Ill. 201, and

cited cases; 4 McQuillin on Mun. Corp. sec. 1582.) The
evidence is very conflicting as to the sort of travel that
passed across this strip before the death of McFarlan, some
witnesses testifying positively there was quite a well de-
fined line of travel and other witnesses testifying just as
positively to the contrary. There is no evidence in the rec-
ord tending to show, in the slightest degree, that the village
authorities ever did any work with reference to a roadway
across this property or ever attempted to exercise any au-
thority over it before McFarlan's death. The first time
they attempted to do any work or exercise such authority
was shortly previous to the beginning of the litigation be-
tween themselves and defendant in error. There is no ques-
tion that for a considerable portion of the time before Mc-
Farlan died the strip was used for a wood yard and was
practically impassable for travel along a defined right of
way. There is also evidence tending to show that this
travel was permissive by the owner and not adverse. The
proof of such acceptance by the public must be unequivocal,
clear and satisfactory. (*City of Chicago* v. *Drexel, supra;
City of Carlinville* v. *Castle,* 177 Ill: 105.) The acceptance
need not immediately follow the offer to dedicate but must
be within a reasonable time and before withdrawal by the
offerer. (Elliott on Roads and Streets,—3d ed.—sec. 172;
*People* v. *Johnson,* 237 Ill. 237.) What constitutes a revo-
cation of an offer to dedicate depends very largely upon the
circumstances of the particular case and is usually a ques-
tion of fact. It may be shown, before acceptance, by acts
inconsistent with the public use to which the land was of-
fered to be dedicated, as by conveyance of the property
offered to be dedicated, or by enclosing the land so as to
exclude the public use, or by erecting buildings on land
offered to be dedicated as a street. (9 Am. & Eng. Ency.
of Law,—2d ed.—78; 3 Dillon on Mun. Corp.—5th ed.—
sec. 1091; 4 McQuillin on Mun. Corp. sec. 1592.) McFar-
lan clearly showed that he intended to revoke this dedica-

tion by the use to which he put the land long before his death. At that time it was owned by his wife, and, apparently acting for her, he built the pavilion or summer house. This tended strongly to show that he, as well as his wife, understood that there had been a revocation of the dedication as to this strip.

Counsel for plaintiffs in error further argue that the testimony of the witnesses who stated that the fences on the easterly and westerly sides of lot 4 formerly ran to the river's edge and were washed away in 1860, or shortly thereafter, is unsatisfactory, as it is shown that their recollection was very poor. Of course, if these fences did run to the water's edge, that fact, in itself, would strongly indicate that McFarlan had revoked the offer to dedicate. It is very clear from all the testimony that this property was used by him, as well as by his wife after him, as if it were private property in which the public had no right. Had this property been owned by him at the time of his death the offer to dedicate would have been revoked by implication by that event. (*People* v. *Johnson, supra; Chicago, Milwaukee and St. Paul Railway Co.* v. *City of Chicago,* 264 Ill. 24.) It not having been accepted by the public during his lifetime, the offer to dedicate could hardly be understood as continued or held open by his grantee or grantees, considering the circumstances shown in this record, unless they did some affirmative act indicating that they intended to continue such offer. The testimony shows, without contradiction, that McFarlan's wife, while she owned the property, claimed this strip as her private property. The man who was marshal and street commissioner of the village for eight or nine years, between 1880 and 1889, testified positively that she told him that this was her private property and that the village authorities could not do any work on it; that she owned it and had entire control over it; and further testified that because of this, during the time he was street superintendent, he did not at-

tempt to do any work for the village on this strip, and, so far as he knew, no wagon drove over it during that time or claimed any right to do so, and that in his judgment there was not a public road there at that time. The village authorities, so far as the evidence shows, acquiesced in this claim by her. If the offer to dedicate had not been revoked previous to this by her husband it was certainly revoked by her during these years. Whatever force the ordinances of the village, passed in 1888, with reference to the name of this street and the public landing, might have had if such action had been taken before the revocation, they would have no effect after the withdrawal of the offer to dedicate. *Birge* v. *City of Centralia, supra; Chicago, Milwaukee and St. Paul Railway Co.* v. *City of Chicago, supra.*

The argument of counsel for the plaintiffs in error that other parts of this strip of land between the southerly line of the lots fronting on the river, on the old and new plats, and the river, had been accepted by the public, and therefore, by implication, this portion of the strip was also accepted, is without force, because an acceptance of a part of the streets on a plat does not necessarily constitute an acceptance of other streets in the same plat, (*City of Chicago* v. *Drexel, supra; Jordan* v. *City of Chenoa,* 166 Ill. 530; *Reichert Milling Co.* v. *Village of Freeburg,* 217 id. 384;) and it must necessarily follow that the acceptance by the public of a portion or all of said strip lying between the south line of the old plat and the river could not in any way affect the acceptance of any portion of this strip on the new plat.

Neither do we think, on the facts in this case, there is merit in the argument that in this case the acceptance should be implied from slight circumstances because the dedication of this disputed strip was necessary or convenient to the public. The proof, as we have already stated, shows, without contradiction, that for more than twenty years before the beginning of this litigation the defendant

in error had claimed exclusive authority over and use of the disputed strip, and that she had used it practically, during all those years, to the exclusion of public travel or public rights. It is quite obvious from the testimony that the trees and rocks were located on this disputed strip in such a manner as to prevent any well defined line of travel as a public highway over said strip, and the evidence is uncontroverted that for years before the beginning of this litigation a wall of rock built across the eastern portion of said strip prevented teams from driving across it. Then, too, the proof shows conclusively that the strip called Water street, east of this disputed strip above the line of the top of the bluff, is practically impassable for public travel, not only because of the deep gully at the east of lot 4 and the impassable character of the bluff east of this gully between Pearl and Dunn streets, but because immediately east of lot 4, in front of one of the lots, for several years previous to this litigation, a hog-pen was built and has since been in use. Manifestly, no great loss or inconvenience was suffered by the public because of defendant in error's control of this strip of land or an attempt by the public authorities to open the street would have been insisted on long ago, as the evidence is uncontradicted that the village authorities knew that Mrs. Rose claimed to own and have authority over the disputed strip from the time the property was deeded to her.

The evidence, under the reasoning in *City of Chicago v. Drexel, supra, Mason* v. *City of Chicago, supra,* and other cases heretofore cited, was ample to support the finding of the circuit court. Its decree must therefore be affirmed.

*Decree affirmed.*