[No. 23239.   Department One.   November 13, 1931.]

A. G. BASIL, *Appellant*, v. L. S. POPE *et al.,*
*Respondents.*[1]

*Frank Preston* and *John I. O'Phelan,* for appellant.
*Welsh & Welsh,* for respondents.

BEELER, J.—At about 6:30 on the afternoon of April
2, 1926, the plaintiff was driving his automobile in an

[1]Reported in 5 P. (2d) 329.

easterly direction on Duryea street, in the city of Raymond, Washington. At the same time, the defendants, Pope and wife, by their minor son, William Pope, were driving their automobile in the same direction, and attempted to drive ahead of the plaintiff, and on so doing, the two cars came into collision and were considerably damaged.

The plaintiff brought an action to recover for the damages to his car, alleging that the accident occurred within a street intersection, and was due to the negligence of the defendants, in that their car was operated at a rate of speed in excess of that prescribed by law. The defendants in their answer denied liability, and by cross-complaint sought to recover for damages to their car. They denied that the place where the accident occurred was a street intersection, and alleged that the collision occurred through the negligence of the plaintiff in making an abrupt turn to the left without giving any warning that he intended to make a left turn.

The cause was tried to the court and a jury, and a verdict was returned for the defendants. Later, the plaintiff was granted a new trial. At the second trial, the jury again returned a verdict for the defendants. The plaintiff again interposed a motion for a new trial, which, however, was overruled. From the judgment entered on the verdict, the plaintiff has appealed.

■ Instruction No. 7 reads:

"You are instructed that the place in Duryea street in which the accident occurred was not at the time of the accident, an intersection as defined by our statute, and that the operator of the defendants' car had a right under the law to operate his automobile over that portion of the street at a rate of speed not to exceed 20 miles per hour, provided the defendant had no right to operate the car at a rate of speed that would endanger the property of another or the life or limb of

any person, and it was his duty at all times to operate his car in a careful and prudent manner.''

The giving of this instruction is assigned as error. Appellant contends that the collision occurred within a street intersection, and that the rate of speed as fixed by statute, at the time and place of the accident, was twelve miles per hour (Rem. Comp. Stat., § 6339). In order to determine whether the place where the accident occurred was a street intersection, we must first determine whether so-called ''Fourth street'' is a street within the legal acceptation of that word.

At the time the streets of the city of Raymond were platted, ''Fourth street'' was shown or designated on the city plat as a street extending north and south from Duryea street, and at right angles thereto. But ''Fourth street'' was never vacated, improved, nor used as a street. Mr. Buckingham, the city engineer of the city of Raymond, called as a witness on behalf of the plaintiff, on his cross-examination testified that ''Fourth street'' has ''never been improved or used.'' It appears from the evidence that ''Fourth street,'' at most, was used merely as a place to accommodate an occasional itinerant circus and to park automobiles.

Webster defines the word ''street'' as ''a city road.'' Bouvier defines it as ''a road in a village or city.''

'' . . . to constitute a street it must appear from the evidence that the street in controversy is a public way used by the public for street purposes.'' *City of Rock Island v. Starkey,* 189 Ill. 515, 59 N. E. 971.

The term ''public highway'' is defined to be

'' . . . any highway, state road, county road, public street, avenue, alley, driveway, boulevard or other place built, supported, maintained, controlled or used by the public or by the state, county, district or municipal officers *for the use of the public as a highway,* or for the transportation of persons or freight, or as

a place of travel or communication between different localities or communities." Rem. Comp. Stat., § 6313, subd. (7). (Italics ours.)

In passing, it may be well to state that the word "intersection" was not defined by the legislature until 1927, which was subsequent to the date of this accident.

It seems clear that "Fourth street," at the time of this accident, was not a street in the eyes of the law. It was a street on paper only. It was never improved nor used as a street. Traffic never moved north and south on "Fourth street" across Duryea street, nor entered Duryea street on "Fourth street" from either the south or the north. In short, the evidence wholly fails to establish that "Fourth street" was ever used by the public as a road or way for travel or transportation. This being so, it is clear that the place where the accident occurred was not within a street intersection.

The case of *Santoro v. Brooks,* 121 Ore. 424, 254 Pac. 1019, in many respects is quite similar to the one here under consideration, the question being whether the place where the accident occurred was a street intersection. The court said:

"There is an issue as to whether the accident occurred upon a street intersection. Defendant contends that at such place, a street from the north intersects the highway. There was introduced in evidence a certified copy of dedication of such a street, being sixty feet in width, as shown by official plat and map of Reedville, filed of record August 18, 1879. At the time of the accident, however, this street was but little used and was a dump ground for a broken down automobile. It was also considered a good place to pile lumber and keep sand and gravel. During one period in its history it was used as a cow pasture and had been farmed to some extent. A store building with a thirty-foot frontage once occupied a large part of the street, but was later removed. As one witness put it, 'This so-called street was all grown up to grass.' . . . Chapter

371, Laws of Oregon of 1921, Section 1, subdivision 29, defines an intersection: '. . . the point or place where one highway or public way joins another at an angle, whether or not it crosses same.'

"In our opinion, this alleged street, under the conditions existing at the time of the accident, did not constitute a 'highway or public way' as contemplated by the Oregon Motor Vehicle Law. The place of the accident was not upon a street intersection, within the meaning of the statute, and it was not negligence per se for the Santoro boy so to drive in excess of twelve miles per hour."

But appellant contends the trial court refused to permit him to introduce testimony and prove that the place where the accident occurred was within a street intersection. We do not so read the record. The learned trial judge accorded to the appellant unlimited latitude to introduce testimony to show the use to which "Fourth street" was put.

"By the Court: I think he (meaning appellant's counsel) can ask if Fourth street has been used for travel and what its condition is. . . . It does not matter what it is used for, I think they can show circuses or any kind of travel, that bears on the question whether it is usable for a street."

There being no testimony to show that "Fourth street" was used as a public street or thoroughfare, the instruction complained of was proper.

Appellant next contends that the trial court erred in refusing to permit him to prove that the place where the accident occurred was generally used by the public as a place to make "U" turns. The appellant had neither pleaded nor proved any city ordinance limiting or designating any particular area on Duryea street where automobiles are required to make a "U" turn. Unless specifically prohibited, it is lawful to turn at any point on a country road or highway with a motor vehicle. The same rule applies to a city or town

unless restricted by city ordinance. Since the appellant has neither alleged nor proved that the city of Raymond by ordinance has undertaken to designate certain particular or specified places on its streets where automobile drivers shall make a "U" turn, it follows that the court properly excluded the testimony offered on that issue.

The appellant next contends that he was denied a fair trial because of misconduct on the part of two jurors, Johnson and Barber, selected as trial jurors in the cause. Johnson is a nephew of the respondent L. S. Pope, while Barber is the father of Glenn Barber, who appeared as a witness for the respondents. On the morning of the second day of the trial, the following occurred:

"By Mr. O'Phelan (appellant's counsel):

"If your Honor please, I merely call this matter to the court's attention. Through lack of information which could have been procured all right from the jury, I neglected to ask one of the jurors as to his qualifications to serve on the jury, and he has the objection mentioned in the first paragraph of section 330. He is now sitting on this panel.

"The Court: The jury will retire for a few minutes. You are not in the custody of the bailiff now, but step out of the court room. Jury excused.

"Mr. O'Phelan: It seems that Roy Johnson, one of the jurors here, I did not interrogate him and might have found that fact out if I had possibly investigated far enough. I did not. I understand he is a nephew or some relation of Mr. Pope's. That is the information I have now. I merely wanted to call it to the court's attention. I do not claim that I was overreached at all. I was not. I had full opportunity to investigate, but the idea never struck me that there was any relationship between the juror and the defendant. I should have, but that is a fact, I understand."

The juror Johnson was subject to challenge for implied bias under Rem. Comp. Stat., § 330.

Litigants are allowed wide latitude by the courts of this state in selecting a jury. But the rule is well established that a party to an action must be diligent in the examination of jurors on their voir dire as to their qualifications; otherwise he will be deemed to have waived his right to objection after verdict.

"It is not enough as a ground for setting aside the verdict of a jury that the moving party was ignorant of the disqualification of a juror and so failed to challenge him. Most courts consider that certain objections to a juror are past remedy after verdict, where due diligence would have discovered them before the juror was selected." 16 R. C. L., p. 288, § 103.

" . . . a failure to examine a juror on his voir dire precludes objection after verdict, whether as to bias, residence, interest, relationship, infancy, misnomer, alienage, property qualification or ignorance of the language." 16 R. C. L., p. 285, § 101.

In *State v. Clark,* 34 Wash. 485, 76 Pac. 98, 101 Am. St. 1006, we said that either party "may waive his right to qualify or disqualify the jurors."

There is no showing that Johnson was evasive, or that he failed to fully answer the questions submitted to him on his voir dire examination. When the appellant discovered the relationship existing between Johnson and respondent L. S. Pope, he made no motion to have the court declare a mistrial.

A somewhat similar situation was before this court in the case of *State v. Hulet,* 159 Wash. 72, 292 Pac. 107. The facts there occurring are tersely stated in the opinion:

"On the second day of the trial, after the witness had testified (on the first day), one of the jurors in the case was seen to eat lunch with the witness Crabtree in a restaurant open to the public, and afterwards to continue in conversation with him for a time, and both rode together in an automobile during the noon recess. No one says that they talked about the case.

They both say that they did not, and Crabtree is not shown to have had any interest in the case one way or the other, he having been called to identify appellant as the man who, under another name, rented the garage, only. The matter was called to the attention of the trial court promptly, who, in effect, said that, in the absence of a motion for a mistrial, there was nothing that he could then do. No such motion was made. . . .

"Having chosen not to move for a mistrial when the matter first became known, and to let the trial proceed in the hope of a verdict of acquittal, appellant cannot now take advantage of the occurrence without making a showing from which a probability, at least, of prejudice can be drawn."

See, also, *State v. Harris,* 69 W. Va. 244, 71 S. E. 609, 50 L. R. A. (N. S.) 933, Ann. Cas. 1913A 889.

Little need be said as to what occurred concerning the juror Barber. His son Glenn, who was riding in respondents' automobile at the time of the accident, had testified for the respondent at the first trial. When Barber was called to the jury box as a trial juror in this case, the appellant and his counsel must have known that, in all probability, the son would again be called as a witness by respondents. Hence the appellant can not now be heard to complain.

And finally, it is contended that the court erred in refusing to strike from the respondents' cost bill the witness fees of Swartz and Jahnke. This item of cost was properly allowed. *Ballard Transfer & Storage Co. v. St. Paul City Ry. Co.,* 129 Minn. 494, 152 N. W. 868. These witnesses not only testified in behalf of respondent's cross-complaint, but also disputed the evidence offered by the appellant in support of his cause of action.

Judgment affirmed.

Tolman, C. J., Parker, Mitchell, and Herman, JJ., concur.